

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-75,582

**JOHN STEVEN GARDNER, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL
### FROM CAUSE NO. 219-81121-06 IN THE 219TH DISTRICT COURT
### COLLIN COUNTY

COCHRAN, J., delivered the opinion of the Court in which PRICE, WOMACK, JOHNSON, KEASLER, HERVEY, HOLCOMB, JJ., joined. KELLER, P.J., filed a concurring opinion in which MEYERS, J., joined.

## OPINION

Appellant was convicted of capital murder for shooting his wife, Tammy Gardner, in the course of committing or attempting to commit burglary or retaliation. Based upon the jury's answers to the special punishment issues, the trial court sentenced him to death. On direct appeal to this Court, appellant raises eleven points of error, including the legal and factual sufficiency of the evidence to support his conviction. After reviewing appellant's points of error, we find them to be without merit. Therefore, we affirm the trial court's judgment and sentence of death.

**Factual Background**

Appellant and Tammy Gardner had a relatively short, but violent, marriage.[1] Before Tammy married appellant in 1999, she was very outgoing and happy. After that marriage, she lost weight, became introverted, and lost her sparkle. Appellant dominated, threatened, and physically abused her. His name was tattooed on her inner thigh.

Jacquie West, Tammy's best friend, testified that the one time she visited Tammy's home after the marriage, she and Tammy's daughter, Jessie, were sitting in the living room when appellant came in, pushed Tammy onto the bed, sat on her, choked her with his hand, and then put a gun to her head. Appellant said that if Jacquie didn't leave, he would kill Tammy. Jacquie left and never returned. Shortly thereafter, Tammy sent Jessie to live with her natural father for her safety.

Both Jacquie and Jessie saw injuries on Tammy's face on various occasions. Tammy told Jessie that one time appellant shoved her into a bookcase, then hit her and gave her a black eye. Jacquie said that Tammy once had a large bruise running diagonally across her face. When confronted, Tammy matter-of-factly admitted that appellant had hit her in the face with a hammer.

---

[1] Both Tammy and appellant had been married multiple times before. Tammy had three children from earlier marriages: John, an adult son who lived in a trailer close to Tammy's rural home; Justin, another son in his early 20's; and Jessie, who was seven or eight when she first met appellant, and who was sixteen by the time of the trial.

Testimony from the punishment phase showed that appellant had been married five times before. Appellant shot his second wife, Rhoda, when she was one-to-three weeks pregnant. She suffered a miscarriage and was rendered a paraplegic. Appellant was convicted of aggravated assault and served eight years in prison for that crime. He met his third wife, Margaret, while he was in prison, and, shortly after their marriage, began to threaten to kill both her and her mother. Margaret often thought of trying to get out of the relationship, but she did not think it was safe because she thought appellant could kill her and her children. After she finally decided to leave appellant, he kidnapped her from work and led police on a high speed chase before he was arrested and returned to prison. He told Margaret that if she left him, he would "hunt her down." She still lives in fear of him.

Both had seen appellant "stalking" Tammy at different times.

Tammy told them  that "she wasn't getting out of there alive," meaning that she would not get out of her marriage alive.  Candace Akins, her boss at the Action Company, a wholesale horse-equipment company, said that Tammy was constantly fearful, nervous, and in extreme financial difficulties.  Tammy said that "she wanted out of the relationship," but she was afraid to leave, and she told Candace many times, "I can't leave, he will kill me."

Tammy eventually went to a neurologist complaining of vision loss, headaches, sleeplessness, anxiety, and depression.  She told the doctor's wife–who was assisting her husband and who had her own family counseling practice–that she was too embarrassed to tell the doctor that her migraines were caused by physical injuries from her husband.  She said that appellant had pulled her hair and hit her both with his fists and with a gun.  She was very frightened of him and kept crying, "The only way I'm going to get out of this relationship is by being dead."  She explained that appellant had threatened to kill her and her children if she left him.

Finally, in December 2004, Tammy borrowed money from her company to file for divorce. On Christmas day she told appellant to move out, so his parents came and took him and his belongings back to Mississippi.  She "perked up" after she filed for divorce, and she began to see more of Jacquie and her daughter Jessie.  At work, Tammy marked her calendar for February 7, 2005, the day her divorce would become final, and she would go over to the calender and say, "You're almost there.  You're almost there."

But she also told Jacquie, Jessie, and Candace that she didn't think she would get to that day because appellant would kill her first.  Jessie testified that appellant kept calling and leaving phone and text messages: "Are you going through with the divorce or not?"  When Jacquie and Tammy had

lunch together at Applebee's on January 20th, Tammy's cell phone started ringing as soon as they got there. It rang constantly, making Tammy upset and scared. She told Jacquie, "He's going to kill me" before the divorce becomes final.

On Sunday, January 23rd, Tammy was driving Jessie home after church when appellant kept text messaging about the upcoming divorce and asking "YES OR NO?" Jessie read the text messages to her mother, who became frantic, but Tammy did not reply to appellant's question. The messages stopped about 5 p.m. Jessie stayed at her father's home that night.

Tammy called David Young, her company's vice-president, early that evening and asked him if she could come talk to him. She arrived around 7:00 p.m. and stayed about three hours, seeking his help in "disappearing" so that no one could track her. Mr. Young was concerned about Tammy's safety, but he felt more comfortable when she called him after she returned home about 11 p.m. According to the phone records, they talked until 11:13 p.m.

At 11:58 p.m., Erin Whitfield, the 911 dispatcher for the Collin County Sheriff's Office, received a 911 call from a woman who identified herself as "Tammy," gave her address, and said she needed an ambulance. Her speech was very slurred and hard to hear, but she said that her husband had either slapped or shot her (Ms. Whitfield wasn't sure until she replayed the tape that the word was "shot"). The woman said that she couldn't hear the dispatcher because her ears were still ringing from gunshots and that her head hurt and "there was blood everywhere." When Ms. Whitfield asked if the person who shot her was still there, the woman said, "No, he left in a white pickup truck with Mississippi plates." She said his name was Steven Gardner. The dispatcher had to yell and repeat herself because the woman sounded like she was choking and vomiting. Then the line disconnected.

Ms. Whitfield dispatched police and paramedics, but it took the police about 25 minutes to arrive because, at first, they went to the wrong address, 3191 FM 2862 instead of 9191 FM 2862. As Deputy Armstrong drove there, he saw a white truck sitting in a ditch by a creek about two or three miles from Tammy's home, but it was only later that he learned that they were looking for a white truck. He was the first to arrive at Tammy's home. He knocked on the doors, but there was no answer, and he could not get in through the windows. He had to kick in the front door. He saw a light on in the bedroom, and, when he entered, he saw Tammy on the bed with a trail of blood leading into the bathroom. She was trying to sit up, but she was bleeding badly from her head and seemed to be in shock.

By the time the paramedics arrived, Tammy was spitting up a lot of blood and mumbling incomprehensibly. She was wearing a red robe. One of the paramedics, Stephanie Taylor, cut the bottom part of the robe off because she couldn't properly assess Tammy's condition while she was dressed. Tammy was flown by helicopter to Parkland Hospital, but she went into a coma, and her family took her off life support two days later. Tammy died from a single gunshot to her head. The bullet had hit her in the front right temple, traveled downward through her brain, and exited below her left ear. Apparently, Tammy had been sitting up against a pillow in bed, and the exiting bullet went through the pillow and out the bedroom window. The bullet was never recovered.

Investigating police found Tammy's house keys–keys that Jessie said her mother always kept in her purse–in a tool chest in the back of her truck parked in the driveway. Nothing else appeared to have been taken from the house. There was no sign of forced entry.

Meanwhile, appellant had borrowed his brother-in-law's white Ford F-150 pickup truck that Sunday afternoon, saying that he was going to visit relatives in nearby Hattiesburg. However,

appellant's credit card was used twice that day at a convenience store in Marshall, Texas, which is on the way from Mississippi to Collin County.  He apparently bought gas for $28.00 and then made another purchase for $3.86.  The backing and store price tag for a pair of Brahma work gloves–an item that the Marshall convenience store sold for $1.49–were later found in the white F-150 pickup.  Appellant's fingerprint was found in that pickup as were fibers that were similar in all respects to red fibers taken from Tammy's robe.

In the early hours of Monday, Collin County Det. Cundiff found appellant's father's telephone number and called him in Mississippi.  Det. Cundiff obtained appellant's cell phone number and called him at 5:15 a.m.  Appellant hung up on him.

Appellant returned to his brother-in-law's home driving the white F-150 pickup at about 8:30 a.m.  His sister, Elaine Holifield, had already been told that Tammy had had "an accident."  She confronted appellant and asked, "What happened?"  He didn't say anything; he just started crying.  She asked if Tammy was okay, and appellant said, "Yes."  Elaine told him that he had to turn himself in to the police, and he said, "Okay."  He showered, changed clothes, shaved, and went first to his parents' home and then to the sheriff's office.  Elaine then went to check for her husband's .44 Magnum that he kept under his mattress.  It was there, with five live rounds and one spent round.  Appellant's brother-in-law testified that he never left spent shells in his gun; he always reloaded it.

When appellant turned himself in to the sheriff's office in Mississippi, officers there called Det. Cundiff in Collin County, who said that he did not have a warrant out for appellant's arrest.  But he asked to speak to appellant on the phone, and appellant agreed.  Det. Cundiff explained that he knew that appellant had been in Texas and he wanted to find out what happened to Tammy.  Appellant said, "I don't have an answer for that one."  When Det. Cundiff explained that Tammy had

been shot in the head, appellant replied, "Okay." Then Det. Cundiff said that Tammy was still alive, and appellant said that she could tell what had occurred "if she wants, that'll be fine." Appellant then went home but was later arrested and brought back to Collin County for trial.[2]

## Sufficiency of the Evidence

In his first two points of error, appellant claims that the evidence was legally and factually insufficient to prove that he committed the offense of capital murder. First, he argues that the evidence was insufficient to establish that he was the person who shot and killed his wife, Tammy. Second, he argues that the evidence was insufficient to prove that he murdered her while in the course of committing either burglary or retaliation.

### A.     The Standard of Review

In assessing the legal sufficiency of the evidence to support a capital murder conviction, we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt.[3] In addressing a claim of factual insufficiency of the evidence, we review all of the evidence in a neutral light, but we are required to give great deference to the jury's assessment of the credibility of the witnesses, the weight of the testimony, and the resolution of any conflicts in the testimony.[4]

---

[2] Because appellant does not raise any issues specifically relating to the sufficiency or admissibility of the evidence at the punishment phase, we need not summarize that evidence.

[3] *Roberts v. State*, 273 S.W.3d 322, 326 (Tex. Crim. App. 2008); *see Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

[4] *Lancon v. State*, 253 S.W.3d 699, 704-05 (Tex. Crim. App. 2008) (in assessing factual sufficiency of the evidence, appellate courts "should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility."); *Roberts v. State*, 220

**B.    Sufficiency of the Evidence to Prove that Appellant was the Shooter**

Appellant argues that the evidence is both legally and factually insufficient to prove, beyond a reasonable doubt, that he was the person who shot Tammy Gardner because no witness could affirmatively "put him at the scene" or even specifically testify that he had left Mississippi on the day that Tammy was shot.

Although no eyewitness testified in court to seeing appellant shoot Tammy or even to seeing him in Texas on the day that she was shot, the State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence.[5]  In this case, the evidence that supports the jury's verdict that appellant was the person who murdered Tammy includes the following:

- Tammy told the 911 dispatcher that appellant, her husband, shot her.[6]

- She told the dispatcher that her attacker was driving a white Ford pickup truck with Mississippi license plates.

- Appellant borrowed his brother-in-law's white Ford pickup truck with Mississippi plates about twelve hours before Tammy was shot.  He returned to his brother-in-law's home in Mississippi about 8:30 a.m. the next day.

- Appellant's credit card was used twice at a convenience store in Marshall, Texas, on the day Tammy was shot.  Cardboard backing with a price tag for Brahma work gloves that the convenience store sold for $1.49 was found in the F-150 pickup after

---

S.W.3d 521, 524 (Tex. Crim. App. 2007) ("a reversal for factual insufficiency cannot occur when 'the greater weight and preponderance of the evidence actually favors conviction.'") (quoting *Watson v. State*, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006)).

[5] *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986).

[6] Appellant argues, in point of error five, that Tammy's statements in the 911 call should not have been admitted.  Even if the trial court erred in admitting those statements, we must consider all evidence, even improperly admitted evidence, when conducting a legal or factual sufficiency analysis.  *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

appellant returned on Monday.

- Appellant's fingerprints were in the F-150 pickup.

- Fibers were found in the F-150 pickup that had exactly the same characteristics–a unique red color, type and size of acrylic fiber, and polymer composition–as fibers taken from the red robe that Tammy was wearing when the police and paramedics arrived after the shooting.

- Appellant previously abused Tammy, both physically and mentally; he stalked her; he threatened her; and he exhibited increasing ire that she was getting a divorce. This evidence established his motive and intent to kill his wife.

- Appellant's sister asked appellant, when he returned to his brother-in-law's home after the shooting, "What happened?" and appellant started to cry and agreed to turn himself in to the police. This was some evidence of his consciousness of guilt.

- The .44 magnum,[7] always kept fully loaded with live bullets under appellant's brother-in-law's mattress, had one spent shell when appellant's sister retrieved it after appellant's return. This evidence supports an inference that appellant used this weapon to shoot Tammy.

Taken as a whole, this evidence was both legally and factually sufficient to establish, beyond a reasonable doubt, that appellant was the person who shot Tammy Gardner.[8] Appellant argues that this evidence shows nothing more than that appellant "could have been the killer." But the jury was entitled to believe Tammy's dying words that he was the killer, especially when her identification was corroborated by so much inculpatory circumstantial evidence of guilt.[9] As for his factual

---

[7] Testimony from the medical examiner established that Tammy's head wound was consistent with having been shot by a large caliber handgun, such as a .44 magnum, although the wound could also have been caused by a smaller caliber weapon.

[8] *Jackson v. Virginia,* 443 U.S. at 319; *Watson*, 204 S.W.3d at 415.

[9] *Hooper v. State,* 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007) (in analyzing legal sufficiency, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict."); *see also Clayton v. State*, 235 S.W.3d 772, 778-82 (Tex. Crim. App. 2007) (setting out legal sufficiency standards and applying them in context of circumstantial-evidence murder

sufficiency claim, appellant does not point to any specific piece of evidence or conflicting testimony that undermines the logical force or probative value of this inculpatory evidence.[10]  When the evidence establishing appellant's identity as the shooter is viewed neutrally, it is not so weak that this finding is clearly wrong and manifestly unjust, nor is this finding contradicted by the great weight and preponderance of the evidence.[11]

Appellant also claims that the evidence is legally and factually insufficient to prove that he murdered Tammy while in the course of committing either burglary[12] or retaliation.[13]  The evidence need be sufficient to prove only one of these two felonies, not both.[14]

Under the present indictment, appellant committed burglary if, without Tammy's effective consent, he entered her home and committed or attempted to commit murder.[15]  In a prosecution for

case to establish identity).

[10] *See Watson*, 204 S.W.3d at 414.

[11] *Id*.

[12] T EX. PENAL CODE § 30.02(a)(3) (a person commits the offense of burglary if, without the effective consent of the owner, the person enters a habitation and commits or attempts to commit a felony, theft, or an assault).

[13] T EX. PENAL CODE § 36.06(a)(1)(A) & (a)(2)(A) (a person commits the offense of retaliation if he intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for or on account of the service or status of another as a prospective witness, or to prevent or delay the service of another as a prospective witness).

[14] *Russeau v. State*, 171 S.W.3d 871, 877 (Tex. Crim. App. 2005) ("[T]he evidence in a capital murder prosecution need be sufficient to establish only one of the underlying felonies alleged in the indictment."); *Ladd v. State,* 3 S.W.3d 547, 557 (Tex. Crim. App. 1999); *Matamoros v. State,* 901 S.W.2d 470, 474 (Tex. Crim. App. 1995).

[15] The pertinent portion of the indictment alleged that appellant intentionally and knowingly caused the death of Tammy Dawn Gardner while he "was in the course of committing or attempting to commit the offense of burglary by then and there intentionally and knowingly entering a habitation without the effective consent of the deceased, the owner thereof, and

capital murder based on burglary, the requirement that a felony be intended is satisfied by the murder

of the victim.[16]  Thus, the only question is whether the evidence is legally and factually sufficient to

prove that appellant did not have Tammy's consent to enter her home sometime between 11:13 p.m.

and 11:58 p.m. on that Sunday night.  Appellant argues that there was "no evidence pertaining to

whether appellant had the deceased's permission to enter the house."  There is, however, ample

circumstantial evidence that Tammy did not consent to appellant's middle-of-the-night entry,

including the following facts:

- Jacquie West, Candace Akins, and Tammy's daughter, Jessie, all testified that Tammy was terrified of appellant and believed that he would kill her.

- Tammy had repeatedly told them that she would never get out of her marriage to appellant alive, that he would kill her first.

- Jessie testified that, on the afternoon of Tammy's death, appellant kept sending her text messages, asking about whether she planned to go through with the divorce, and, when Tammy did not respond to those messages, his messages became shorter and bigger until they culminated with repeated texts: "YES OR NO?"  Tammy was frantic as she drove down the road with Jessie.

- Immediately before her murder, Tammy had spent three hours visiting with the vice-president of her company seeking his assistance to help her "disappear" so that no one could track her down.

- Appellant had kept a second set of keys to Tammy's house when he left at Christmas after giving one set to Tammy's son, John.

- The physical condition of the bedroom leads to a reasonable inference that Tammy was surprised by the intruder and shot as she was sitting up in bed, propped up by pillows.

The jury could infer from this evidence that Tammy would not, and did not, give appellant consent

committing the felony offense of murder[.]"

[16] *Matamoros,* 901 S.W.2d at 474.

to enter her home after 11 p.m. on January 23, 2005.[17]  Viewing the totality of the evidence, the jury could reasonably infer that appellant drove to Tammy's isolated rural home, used his extra key to open the front door, walked down to the bedroom to confront Tammy sitting up in bed, shot her through the right temple, took the house keys from her purse hanging on the bedpost, locked the front door as he left, put Tammy's keys into the tool box in Tammy's truck, stopped at a ditch two to three miles down the road (perhaps to throw his extra set of keys into the ditch), and then drove back to Mississippi.  Tammy, meanwhile, was still conscious enough to put on her red robe, which was hanging on the bedpost, look outside to see appellant departing in the white Ford truck with Mississippi plates, and then call 911 to summon an ambulance.  Because the evidence is both legally and factually sufficient to prove that appellant murdered Tammy while in the course of committing burglary, we need not decide whether it is also, or alternatively, sufficient to prove appellant shot Tammy while committing the offense of retaliation.[18]

Accordingly, we overrule appellant's points of error one and two.  We address appellant's evidentiary claims before those dealing with jury selection, because they are of general interest to the bench and bar.

---

[17] See Ellis v. State, 726 S.W.2d 39, 40-41 (Tex. Crim. App. 1986) (circumstantial evidence in capital murder trial was sufficient to prove that deceased did not give defendant, the apartment maintenance man who had a master key, consent to enter her apartment).
Appellant argues that the State's theory at trial was that it did not matter if Tammy initially invited appellant into her home, because, if he entered with the intent to kill her, that consent was not "effective."  Appellant points to a single question and answer posed to Det. Cundiff and claims that "[t]his is illogical."  Although the State argues that Ellis would support such a theory of consent obtained by fraud, it beggars belief that this evidence supports a conclusion that Tammy would invite appellant, a man whom she deeply feared and believed would kill her before she could obtain her divorce, into her home in the middle of the night after the bombardment of increasingly irate messages she had received that very day from appellant.

[18] See Russeau, Ladd, and Matamoros, supra note [14].

**Evidentiary Issues**

In three points of error, appellant challenges the trial judge's admission of evidence during the guilt phase of the trial.

A.    **The Admissibility of Tammy's 911 Call**

In his fifth point of error, appellant claims that the trial judge erred in permitting Erin Whitfield to testify to the contents of the 911 call Tammy made after she was shot. Appellant objected to Ms. Whitfield's testimony at trial,[19] arguing that this testimony was hearsay and that it violated the Confrontation Clause of both the federal and Texas constitutions. The State argued that it was a nontestimonial statement and admissible as (1) a dying declaration, (2) an excited utterance, and (3) a present sense impression. Because we find that the 911 call was admissible as a dying declaration,[20] we need not address its admissibility as a nontestimonial excited utterance or present-

---

[19] Appellant requested and received a running objection to the entire 911 conversation.

[20] Appellant concedes that if Tammy's 911 call qualified as a dying declaration, "neither the Confrontation Clause nor *Crawford* [*v. Washington*, 541 U.S. 36 (2004)] or *Davis* [*v. Washington*, 547 U.S. 813 (2006)] would bar its admission." Appellant's Brief at 44. Although this question was not explicitly addressed by the Supreme Court, appellant's concession seems well taken. *See Crawford*, 541 U.S. at 56 n.6 ("We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*."); *Giles v. California*, 128 S.Ct. 2678, 2682-84 (2008) ("We have previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted. The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying. . . . ¶ In cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying–as in the typical murder case involving accusatorial statements by the victim–the testimony was excluded unless it was confronted or fell within the dying declaration exception.") (internal citations omitted); *see also State v. Lewis*, 235 S.W.3d 136, 148 (Tenn. 2007) ("Since *Crawford,* we found no jurisdiction that has excluded a testimonial dying declaration. Several states have specifically allowed the declaration as an exception to the rule in *Crawford. See, e.g., Wallace v. State,* 836 N.E.2d 985, 992-96 (Ind. Ct. App. 2005); *State v. Young,* 710 N.W.2d 272, 283-84 (Minn. 2006)."); *People v. Monterroso*, 101 P.3d 956, 971-72 (Cal. 2004) ("if, as *Crawford* teaches, the confrontation clause 'is most

sense impression.

Under Rule 804(b)(2) of the Texas Rules of Evidence, a dying declaration is a "statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death."[21]  This exception to the hearsay rule has been accepted under common-law tradition since before the drafting of the American Constitution.[22]  Texas courts have long held that the dying declaration exception does not infringe upon a criminal defendant's right of confrontation under the Texas Constitution.[23]  Under

---

naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding,' it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment.") (internal citation omitted).

[21] TEX. R. EVID. 804(b)(2).

[22] According to Dean Wigmore, dying declarations merited special treatment in the courts as early as the twelfth century.  5 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 1430 n.8 (James H. Cadbourn rev.1974).  Dean Wigmore notes that Shakespeare referred to the doctrine before it became an established common-law rule.  2 JOHN H. WIGMORE, WIGMORE'S EVIDENCE §1438 at 1804 n.1 (1904).  In KING JOHN, Lord Melun utters, "Have I not hideous death within my view,/ Retaining but a quantity of life,/ Which bleeds away, even as a form of wax/ Resolveth from his figure 'gainst the fire?/ What in the world should make me now deceive,/ Since I must lose the use of all deceit?/ Why should I then be false, since it is true/ That I must die here and live hence by truth?" WILLIAM SHAKESPEARE, KING JOHN act 5, sc. 2, lines 26-33. Although Lord Melun may not have created the rule, he expressed it well.

[23] *See Burrell v. State*, 18 Tex. 713, 731 (1857) ("It has been uniformly held that the admission of this evidence [of a dying declaration] does not infringe the constitutional right of the accused to be confronted by the witnesses against him.").  In *Taylor v. State*, 43 S.W. 1019 (Tex. Crim. App. 1898), this Court held that a dying declaration does not violate the right of confrontation and explained,

> In a case of dying declaration the witness does confront the appellant at the trial.
> It is true, the witness states the declaration of the decedent as to the cause and
> manner of his death.  This declaration is itself, under the authorities, made original
> testimony; and it is considered as original evidence, and not hearsay, when given
> by any witness who may have heard such declaration when made under the
> circumstances required by law–that is, that the declarant must be conscious at the

Texas common law, the proponent of a dying declaration was required to establish that it was made (1) when the declarant was conscious of approaching death "and had no hope of recovery," (2) voluntarily, (3) without persuasion or influence from leading questions, and (4) when the declarant was of sound mind.[24] This predicate could be established by either direct or circumstantial evidence, and it was not essential that the declarant actually say that he was conscious of impending death or without hope of recovery.[25] Each case depends upon its particular circumstances, but sometimes the declarant's conduct and the nature of his wounds would suffice.[26] Under the modern-day Rule 804(b)(2), the common-law requirement that "there was no hope of recovery" was abrogated, and

---

> time of approaching death, and believe that there was no hope of recovery, and that such declaration was voluntarily made, and not through the persuasion of any person, and that the same was not made in answer to interrogatories calculated to lead the deceased to make any particular statement, and that such declarant was at the time of sound mind.

*Id.* at 1020.  Dean Wigmore, in 1904, noted that the admission of dying declarations does not violate the Confrontation Clause.  2 WIGMORE'S EVIDENCE § 1398 at 1758.

[24] *See, e.g., Silva v. State*, 546 S.W.2d 618, 620 n.1 (Tex. Crim. App. 1977); *Ledbetter v. State*, 5 S.W. 226, 227 (Tex. App. 1887).

[25] *Morgan v. State*, 113 S.W. 934, 937-38 (Tex. Crim. App. 1908) (predicate sufficient if "it satisfactorily appears, in any mode, that they were made under that sanction, whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants, stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to, in order to ascertain the state of the declarant's mind.").

[26] *See* 1A ROY R. RAY, TEXAS PRACTICE: TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL § 976 at 232 (3rd ed 1980) (collecting illustrative cases).  The Texas position was in accord with established common law.  As Dean Wigmore noted, "we may avail ourselves of any means of inferring the existence of such knowledge [of imminent death]; and, if in a given case the nature of the wound is such that the declarant must have realized his situation, our object is sufficiently attained."  2 WIGMORE'S EVIDENCE § 1442 at 1809 (collecting English and American cases). "The circumstances of each case will show whether the requisite consciousness existed, and it is poor policy to disturb the ruling of the trial judge upon the meaning of these circumstances." *Id.*

the focus turned more to the severity of the injuries than the declarant's explicit words indicating

knowledge of imminent death.[27]   All that the rule requires is sufficient evidence, direct or

circumstantial, that demonstrates that the declarant must have realized that he was at death's door

at the time that he spoke.  It is both (1) the solemnity of the occasion–the speaker peering over the

abyss into the eternal–which substitutes for the witness oath,[28] and (2) the necessity principle–since

---

[27] *Burks v. State*, 876 S.W.2d 877, 901 (Tex. Crim. App. 1994) ("[W]e take note of the fact that Rule 804(b)(2) does not require, as did its antecedent, that the declarant believe he had no hope for recovery.  The drafters omitted that language from 804(b)(2).") (quoting 33 STEVEN GOODE, GUY WELLBORN & MICHAEL SHARLOT, GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 804.4, at 612 (Texas Practice 1988)); *Bisby v. State*, 907 S.W.2d 949, 956 (Tex. App.—Fort Worth 1995, pet. ref'd) ("The requirement that the declarant believed his death was imminent may be inferred from the circumstances of the case such as the nature of the injury, medical opinions stated to the declarant, and the declarant's conduct at the time."); *Franks v. State*, 625 S.W.2d 820, 822 (Tex. App.—Fort Worth 1981, no pet.) ("Although there was no direct testimony that deceased thought he was dying, this element was sufficiently established by the testimony as to the severity of the wound which ultimately proved fatal.").

This modern, liberalizing trend may be attributable to Dean Wigmore's tirade against legal technicalities triumphing over common sense.  He stated,

> It must be said, however, that in ascertaining generally the existence of a knowledge of approaching death, Courts are now and then found making rulings at which common sense revolts.  Moved either by a disinclination to allow the slightest flexibility of a rule in applying principles to circumstances, or by a general repugnance to exceptions to the Hearsay rule, they have recorded decisions which can only be derided by laymen and repudiated by the profession.  It is the narrow and over-cautious spirit of such decisions which tends to stunt the free development and application of living principles, to hamper the administration of justice, and to undermine public confidence in legal procedure; and no opportunity ought to be omitted of censuring the manifestations of this spirit.

2 WIGMORE'S EVIDENCE § 1442 at 1808-09 (footnote omitted). *See generally,* Ferdinand S. Tinio, *Sufficiency of Showing Consciousness of Impending Death, by Circumstances Other Than Statements of Declarant, to Justify Admission of Dying Declaration,* 53 A.L.R.3d 1196 (1965, updated 2009).

[28] *See Mattox v. United States*, 146 U.S. 140, 152 (1892) (stating that "the certain expectation of almost immediate death will remove all temptation of falsehood and enforce as strict adherence to the truth as the obligation of an oath could impose").

the witness had died, there was a necessity for taking his only available trustworthy statements[29]–that

provide the underpinning for the doctrine.  As with the admission of all evidence, the trial judge has

great discretion in deciding whether a statement qualifies as a dying declaration.[30]

Appellant argues that (1) "nothing in [Ms.] Whitfield's testimony demonstrated the caller in

any way believed her death was imminent" and (2) Ms. Whitfield could not identify the caller

because she had never spoken to Tammy Gardner and did not recognize the voice on the phone.  We

believe that there is evidence sufficient to show both that it was Tammy Gardner who made the 911

call to Ms. Whitfield and that Tammy knew that she was dying.

Erin Whitfield testified that the person who made the 911 call at 11:58 p.m. identified herself

as "Tammy," gave her address (which was the address of Tammy Gardner), and said that she needed

an ambulance.  She said that her husband, Steven Gardner, had shot her, and that he had left in a

white pickup truck with Mississippi license plates (exactly the type of truck that appellant was

driving that night).  When police and paramedics finally arrived at the location that the caller had

given them, they found Tammy Gardner in her bed, bleeding profusely from a gunshot wound to her

---

[29]  2 WIGMORE'S EVIDENCE § 1431 at 1799; *see Carver v. United States*, 164 U.S. 694, 697 (1897) (dying declarations are admitted by necessity "to prevent an entire failure of justice, as it frequently happens that no other witnesses to the homicide are present").

[30] *See Montgomery v. State*, 810 S.W.2d 372, 378-79 (Tex. Crim. App. 1990) (trial judge has great discretion in the admission of evidence at trial); *Coffin v. State*, 885 S.W.2d 140, 149 (Tex. Crim. App. 1994) ("The trial court is the institutional arbiter of whether hearsay is admissible under exceptions to the general rule of exclusion of such testimony . . . . Thus, whether evidence comes in under Rule 804(b)(1) is a question for the trial court to resolve, reviewable on appeal only under an abuse of discretion standard."); *Magee v. State*, 994 S.W.2d 878, 887 (Tex. App.—Waco 1999, pet. ref'd) (trial court did not abuse its discretion in admitting statement as a dying declaration); *Wilks v, State*, 983 S.W.2d 863, 866 (Tex. App.—Corpus Christi 1998, no pet.) (trial court did not abuse its discretion in admitting dying declaration); *Scott v. State*, 894 S.W.2d 810, 811-12 (Tex. App.—Tyler 1994, pet ref'd) (same).

head.  This is sufficient evidence to support a finding that the person who made the 911 call was indeed Tammy Gardner, the deceased.[31]

In determining that sufficient evidence supported a finding that Tammy believed that her death was imminent, the trial judge could have relied upon the following facts:

(1)     The single bullet entered her right temple, went through her brain, and exited below her left ear.  This was a mortal wound;

(2)     Ms. Whitfield testified that Tammy's voice was very slurred and hard to understand;

(3)     Tammy kept repeating that her head hurt and that she could not hear very well "because her ears were ringing from the gunshots";

(4)     She said that her husband had shot her, there was blood everywhere, and she needed an ambulance;

(5)     Before the phone disconnected, Ms. Whitfield heard what sounded like Tammy choking and vomiting;

(6)     When the first deputy arrived, he found Tammy on the blood-soaked bed, trying to sit up; she appeared to be in shock and was bleeding badly from both the back and top right of her head;

(7)     There was a trail of blood leading into the bathroom, around the toilet, and in the trash can;

(8)     When the paramedics finally arrived, Tammy was "spitting up a lot of blood" and mumbling incomprehensibly;

(9)     She was in a vegetative state and died at the hospital two days later.

To satisfy the dying declaration exception, Tammy's sense of impending death may be

---

[31] TEX. R. EVID. 901(b)(4); *see Earnhart v. State*, 582 S.W.2d 444, 448-49 (Tex. Crim. App. 1979) ("In admitting the contents of a telephone conversation, the identity of the speaker is sufficiently established if the message reveals that the speaker has knowledge of facts that only the speaker would be likely to know."); *In re R.J.W.,* 770 S.W.2d 103, 104 (Tex. App.—Houston [1st Dist.] 1984, no writ) (the combination of self-identification and circumstantial evidence sufficiently established the identity of the 911 caller).

established in any satisfactory mode, including her express words, her conduct, the severity of her wounds, the opinions of others stated to her, or any other relevant circumstances.[32]  The totality of the circumstances set out in this record support the trial judge's conclusion that Tammy believed that her death was imminent at the time she made the 911 call, even though she did not expressly state that belief and no one explicitly told her that she was dying.[33]  The trial judge did not abuse his discretion in admitting Ms. Whitfield's testimony concerning Tammy's dying declaration.[34]  Appellant's fifth point of error is overruled.

**B.    The Admission of Tammy's Red Robe**

In his sixth point of error, appellant claims that the trial judge erred in admitting State's Exhibit 36, the red robe that Tammy was wearing when paramedics arrived.  Appellant argues that Stephanie Taylor, the responding paramedic, could testify only that the robe "appeared to be" the same robe that Tammy was wearing, and, because there was no chain-of-custody testimony,[35] the

---

[32]  WIGMORE'S EVIDENCE § 1442 at 1808-09; *see, e.g., Mattox*, 146 U.S. at 151-52 (error to exclude dying declaration that fit the exception, in part because "the wounds were three in number and one of them of great severity"); *People v. Monterroso*, 101 P.3d 956, 971-72 (Cal. 2004) (post-*Crawford* decision; sufficient evidence to support admission of dying declaration based on severity of victim's wounds, which were the cause of his death, the victim's evident pain and fear of death as he lay on the ground in a fetal position, and the fact that he never spoke again before his death 11 days later); *United States v. Barnes*, 464 F.2d 828, 831(D.C. Cir. 1972) (murder victim's statement made in intensive care unit seven hours after defendant set her on fire fit the exception, partly because she was "obviously in severe pain and spoke and breathed with great difficulty.").

[33]  *Bisby*, 907 S.W.2d at 956; *Franks*, 625 S.W.2d at 822; *Tinio*, 53 A.L.R.3d 1196, § 8.

[34]  *See Coffin*, 885 S.W.2d at 149; *Magee*, 994 S.W.2d at 887; *Wilks*, 983 S.W.2d at 866.

[35]  At trial, appellant's objection went only to the chain of custody because Ms. Taylor testified that she did not collect and keep the red robe until the time of trial.  But the State was not required to prove a chain of custody if Ms. Taylor could authenticate State's Ex. 36 by other means, such as the red robe's distinctive characteristics.  *See Hartsfield v. State*, 200 S.W.3d 813,

State failed to authenticate Exhibit 36 as being the very same robe that Tammy was wearing on the night she was shot.

An item of physical evidence offered at trial must be authenticated under Rule 901.[36] Rule 901(b) sets out a nonexclusive list of methods for authenticating evidence, including,

> (1) **Testimony of Witness With Knowledge.** Testimony that a matter is what it is claimed to be.
> . . .
> (4) **Distinctive Characteristics and the Like**. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.[37]

Stephanie Taylor testified that Tammy was wearing a red robe when the paramedics arrived. She had to cut it off to complete her original assessment of Tammy. She recognized State's Ex. 36 as being the "exact" same red robe because of (1) the distinctive jagged marks she made around the front zipper with her trauma shears and (2) the blood stains near the neck area. Based on this testimony, the trial judge did not abuse his discretion in admitting State's Ex. 36 as having been authenticated as Tammy's red robe.[38] Furthermore, any possible error in the admission of State's Ex. 36 was harmless because appellant affirmatively stated "No objection" when a sample cut from

---

817-18 (Tex. App.—Texarkana 2006, pet. ref'd) (proponent of evidence need not always prove a chain of custody; "If the item has distinct or unique characteristics, a witness may authenticate it by testifying that he or she has previously seen the item at the relevant time and place and that the witness recognizes it by its distinctive characteristics.").

[36] TEX. R. EVID. 901(a) (the authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.").

[37] TEX. R. EVID. 901(b)(1) & (4).

[38] *See Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007) ("The trial judge does not abuse his or her discretion in admitting evidence where he or she reasonably believes that a reasonable juror could find that the evidence has been authenticated or identified").

that robe was introduced into evidence as a comparison sample to the red fibers found in the white truck appellant had borrowed from his brother-in-law.[39]  Appellant's sixth point of error is overruled.

## C.     Admission of Appellant's phone conversation with Det. Cundiff

In his seventh point of error, appellant claims that the trial court erred in admitting a recording of the telephone conversation between appellant and Det. Cundiff after appellant went to the Jones County Sheriff's Office in Mississippi to "turn himself in" at his sister's suggestion. Appellant argues that, even though he was not literally under arrest at the time of the conversation, he was the "focus" of the police investigation and was therefore entitled to *Miranda*[40] warnings under *Escobedo v. Illinois*.[41]  But being the "focus" of an investigation does not necessarily render a person "in custody" for purposes of receiving *Miranda* warnings or those required under article 38.22 of the Code of Criminal Procedure.[42]  The appropriate inquiry is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."[43]

The warnings required by *Miranda* and article 38.22 are intended to safeguard a person's

---

[39] *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (the erroneous admission of evidence is harmless when that same evidence is later admitted without objection).

[40] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[41] 378 U.S. 478 (1964).

[42] *See Beckwith v. United States*, 425 U.S. 341, 347 (1976); (even though defendant was "the focus" of IRS investigation, he was not "in custody" for purposes of *Miranda* warnings when he was interviewed in a private home); *Wicker v. State*, 740 S.W.2d 779, 785 (Tex. Crim. App. 1987).

[43] *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *see also Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007) ("custodial interrogation" is questioning initiated by police officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way).

privilege against self-incrimination during custodial interrogation.[44] "At trial, the defendant bears the initial burden of proving that a statement was the product of 'custodial interrogation.'"[45] This Court has found four general situations that may constitute custody for purposes of *Miranda* and article 38.22:

(1)     The suspect is physically deprived of his freedom of action in any significant way;

(2)     A law enforcement officer tells the suspect he is not free to leave;

(3)     Law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and

(4)     There is probable cause to arrest the suspect, and law enforcement officers do not tell the suspect he is free to leave.[46]

The evidence shows that appellant voluntarily went to the sheriff's office and talked to officers, who then called Det. Cundiff in Collin County. Det. Cundiff told them that he did not have an arrest warrant for appellant but that he wanted to talk to him. Appellant voluntarily spoke with Det. Cundiff, who told appellant that he was not under arrest. Det. Cundiff just wanted to know what appellant knew about Tammy's injuries. When he told appellant that Tammy was still alive, appellant told him that she "can tell you [what happened] if she wants, that'll be fine." The conversation ended shortly thereafter, and appellant went home. The State offered a recording of that conversation as State's Exhibit 61.

Appellant states that Det. Cundiff "had identified Appellant as the prime suspect and was acting on that identification in his attempts to garner incriminating evidence" during the phone conversation.[47] Appellant implies that he was in custody under the fourth *Dowthitt* factor because Det. Cundiff had probable cause to arrest him by the time that they spoke on the phone. Regardless

---

[44] *Herrera*, 241 S.W.3d at 525-26.

[45] *Id.* at 526.

[46] *See Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996).

[47] Appellant's Brief at 52.

of whether Det. Cundiff had probable cause and could have obtained an arrest warrant, he did not have one at the time of their conversation, and he told both the Mississippi deputies and appellant that he did not have a warrant and that appellant was not under arrest.  Furthermore, appellant said nothing to Det. Cundiff that furnished probable cause, and Det. Cundiff never told appellant that he was "a prime suspect."[48]  Indeed, appellant left the police station and went home after talking with Det. Cundiff.

Appellant has failed to establish that he was in custody during the telephone conversation. Therefore, the trial judge did not abuse his discretion in admitting the recording of that noncustodial conversation.[49]  Furthermore, any error in the admission of that recording was harmless because appellant made no incriminating statements to Det. Cundiff.[50]  At most, the conversation showed that appellant did not offer any explanation for being in Texas and that he did not display any emotion when he was informed that his wife had been shot.  Appellant has not suggested that anything in that conversation was inculpatory or harmful.  Appellant's point of error number seven is overruled.

## Challenges to the Veniremembers

In point of error three, appellant claims that the trial judge improperly denied his challenges for cause to five veniremembers: Donna Williams, Donna Crabtree, William Chambers, David Sanford, and Susan McMillan.  He asserts that their answers to various questions demonstrated that

---

[48] *See Dowthitt*, 931 S.W.2d at 255 (fourth category applies only when officer's knowledge of probable cause is communicated to suspect or by suspect to officer; even then custody is established only "if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest.").

[49] *Herrera*, 241 S.W.3d at 526.

[50] *See Jones v. State*, 119 S.W.3d 766, 783 (Tex. Crim. App. 2003) (erroneously-admitted, non-*Mirandized* statement was harmless beyond a reasonable doubt); *Harryman v. Estelle*, 616 F.2d 870, 875-78 (5th Cir. 1980) (constitutional harmless-error rule applies to admission of non-*Mirandized* statements; admission of defendant's statement was harmless in light of physical evidence of guilt).

they could not be fair and impartial jurors in this case.  In his fourth point of error, appellant claims

that the trial court improperly disqualified Veniremember Charles Perry.  We first set out the

appropriate standards of review.

## A.     Appellant's burden on appeal

A veniremember is challengeable for cause if he has a bias or prejudice against the defendant

or against the law upon which either the State or the defense is entitled to rely.[51]  The test is whether

the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath

and instructions in accordance with the law.[52]  Before a prospective juror may be excused for cause

on this basis, the law must be explained to him, and he must be asked whether he can follow that

law, regardless of his personal views.[53]  Finally, the proponent of a challenge for cause has the

burden of establishing that the challenge is proper.[54]  The proponent does not meet this burden until

he has shown that the veniremember understood the requirements of the law and could not overcome

his prejudice well enough to follow the law.[55]  When the record reflects that a veniremember

vacillated or equivocated on his ability to follow the law, the reviewing court must defer to the trial

judge.[56]

We review a trial court's ruling on a challenge for cause with considerable deference because

the trial judge is in the best position to evaluate a veniremember's demeanor and responses.[57]  A trial

---

[51] TEX. CODE CRIM. PROC. art. 35.16(a)(9) & (c)(2); *Feldman v. State,* 71 S.W.3d 738, 743-45 (Tex. Crim. App. 2002).

[52] *Feldman*, 71 S.W.3d at 744.

[53] *Id.*

[54] *Id.* at 747.

[55] *Id.*

[56] *Moore v. State,* 999 S.W.2d 385, 400 (Tex. Crim. App. 1999).

[57] *Colburn v. State,* 966 S.W.2d 511, 517 (Tex. Crim. App. 1998).

judge's ruling on a challenge for cause may be reversed only for a clear abuse of discretion.[58]  When a veniremember's answers are ambiguous, vacillating, unclear, or contradictory, we give particular deference to the trial court's decision.[59]

In this case, appellant exhausted all of his peremptory challenges, and the trial judge granted him an additional strike.  Thus, appellant must show that the trial judge improperly denied at least two of his challenges for cause.[60]

## B.     Veniremember Donna Williams

Appellant challenged Ms. Williams, claiming that she would automatically impose the death penalty.  Ms. Williams stated that she believed in the death penalty "if all the evidence is there."  She described herself as being "tough" in holding people accountable.  She thought that the death penalty should be an option for murder committed in the course of a burglary or retaliation, but that it would not be "automatically required."  She stated that she would not give an automatic answer on the future dangerousness issue and that she would give both defense and State a "fair shot" on the mitigation issue.  She agreed with defense counsel that the death penalty was not the only way to hold someone accountable in a capital murder case.  When counsel asked her about her application of the death penalty, Ms. Williams replied, "I wouldn't automatically vote for death."  His questioning continued:

Q:     In the situation, as Question No. 9 [of the juror questionnaire asking about murder in the course of burglary or retaliation], is that an automatic death penalty for you?
A:     Of intentional murder?
Q:     Yes.  Following exactly what this question says.
A:     Yes.
Q:     It's an automatic death?
A:     If it's capital murder and it's proven.
Q:     Could you consider a life sentence in that case?  Let me rephrase that.  In listening to you, would it be correct to say that you couldn't consider a life sentence?
A:     No, I could.

---

[58] *Id.*

[59] *Id.*

[60] *See Newbury v. State*, 135 S.W.3d 22, 31 (Tex. Crim. App. 2004).

Q:     Then I'm a little confused because I thought you said that it was an automatic death.
A:     In the State of Texas.
Q:     This is a hypothetical, and you're sitting on a jury panel, and this is what–you have found it was an intentional murder committed in the course of committing burglary or committing retaliation of capital murder in which the death penalty may be imposed. You agree with that law, correct?
A:     Yes.
Q:     Do you agree that that would be an automatic death penalty?
A:     Yes.

Appellant asserts that this exchange demonstrates that Ms. Williams would automatically impose the death penalty in this type of capital murder case even though she had repeatedly said that she could consider a life sentence. Reading this exchange one way, it seems that Ms. Williams changes her mind with each question. Reading this exchange another way, it seems she mistakenly thought that, under Texas law, the death penalty was an "automatic" *option* in this type of capital murder case,[61] but that she herself would not automatically vote for a death sentence; she could consider a life sentence, depending on the facts. In resolving ambiguities and contradictions in jury questioning, we must give great deference to the trial judge's assessment of the veniremember's meaning based on demeanor, tone, and the totality of the questioning. This record supports a conclusion that Ms. Williams would not automatically impose a death sentence in this type of capital murder, even though she considered that sentence to be an automatic option.[62] At worst, Ms. Williams's responses were sometimes contradictory and vacillating. The trial judge did not abuse his discretion in denying appellant's challenge for cause.[63]

## C.     Veniremember Donna Crabtree

Appellant has forfeited any complaint on appeal about this veniremember because he did not

---

[61] The death penalty is not an automatic option for the jury. The death penalty is only an option if the prosecutor decides, before trial, to seek it. *See* TEX. CODE CRIM. PROC. art. 1.13(a); *id.* art. 37.071, § 2(a)(1);

[62] *See Moore*, 999 S.W.2d at 400; *Colburn*, 966 S.W.2d at 517.

[63] *See Moore*, 999 S.W.2d at 400.

challenge her for cause in the trial court.[64] But even if he had challenged Ms. Crabtree for cause, the trial judge would not have abused his discretion had he denied it. Ms. Crabtree had initially stated on her juror questionnaire that the death penalty should be automatic for murder committed during a burglary. But once the law had been explained to her, she said that she would "have to view it with different glasses," and would hope that she "would be open for mitigating circumstances." She told the prosecutor several times that she would keep an open mind, be fair to both sides, wait to hear the evidence, and not automatically say either a death sentence or a life sentence. She told defense counsel that, while the death penalty should be an option for murder during a burglary, she did not mean that it should be "automatic" in such a case. She then said that when she answered Question 9 on the questionnaire, she did not know the law about the special punishment issues and she had thought that death was automatic if the defendant committed murder during a burglary. "I guess that's what it kind of does, if they commit a murder during burglary, they should be killed because nothing can bring the victim back." Defense counsel then repeated his question, "So what you're saying is that's an automatic death sentence?" Ms. Crabtree agreed. But then she added, "I'm really kind of confused at what you're asking me–do I need to get to that in terms of burglary? If this is his first time, and he kills someone, do I think he needs to be killed? I think that needs to be brought up to see if he would be a continuing threat." She said that she had thought all murders were capital murders, and that committing a murder during a burglary required a death sentence. But once she understood what the law was, she stated that she could consider the special issues and weigh mitigating circumstances: "Is it dust or is it a boulder?" Ms. Crabtree was a classic vacillating juror,

---

[64] Appellant's trial counsel stated, "Your Honor, it's our position that–we believe that if we were allowed to ask about extraneous offenses, as we've requested of this Court before, that she would be challenged because of failure to be able to take into consideration mitigation, specifically regarding the–as relates to extraneous offenses, we will use a peremptory strike, Your Honor." Appellant had wanted to ask veniremembers if they could give a life sentence to someone that they had found guilty of a capital murder and who had also previously shot someone. The trial judge did not permit this type of commitment question under *Standefer v. State*, 59 S.W.3d 177, 181-82 (Tex. Crim. App. 2001).

and the trial judge could have concluded from her demeanor, tone, and the totality of the questioning that she could follow the law once it had been explained to her.[65] But the trial judge was never asked to make that decision because appellant did not challenge Ms. Crabtree for cause, thereby forfeiting this issue on appeal.[66]

## D.    Veniremember William Chambers

Appellant challenged Mr. Chambers based on the strength of his religious beliefs. Mr. Chambers stated that he was a man of faith who "follow[s] the law of the Bible," but he also said that he could set aside his personal beliefs and follow the law given to him by the court. At one point, Mr. Chambers and defense counsel engaged in a colloquy concerning Scriptures and the law:

Q:    So during the trial, or if during the charge of the Court, you find something that violates the Scriptures, you couldn't follow the law, but you said you would follow the Scriptures; is that correct?

A:    Yes, but I hedge my bets on that one for the simple reason that what I conclude to be Scripture may differ with what other people conclude to be Scripture. So I've got my understanding of it that there are certain places where I don't have a problem with stepping aside from my personal beliefs and applying, say, the law. You know, but it's there–it's varied.

Q:    But there's other times where you couldn't step aside from the Scriptures and follow the law, correct?

A:    Well, to put it this way, what I can't do is violate what my God tells me to do. In my experience, and particularly as I've grown older, in this country, according to these laws, I've not come into it ever. If I did, then I've got to be honest and say I'd go there.

Q:    And that's why I just want you to be honest that if somewhere during this proceeding you find that the law is–the law as given to you, the law that's as described to you, the charge of the Court that says this is what you shall do, if you find that in violation of the Scripture, you're not going to follow that law; you're going to follow what you defined as your Scripture, correct?

A:    I would have to, yes.

Shortly thereafter, Mr. Chambers said that he would consider mitigation issues and would have no problem doing so. Throughout his questioning, Mr. Chambers stated that he could answer the special issues yes or no depending on the facts and circumstances and that nothing that he had heard

---

[65] *Colburn*, 966 S.W.2d at 517.

[66] *See Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007) (a challenge for cause is forfeited if it is not made).

about following the law conflicted with his conscience.

Although a juror who will ultimately be guided by his personal beliefs rather than the law is not a qualified juror,[67] Mr. Chambers never suggested that his personal beliefs were actually in conflict with the applicable law, and he repeatedly stated that he could follow the law of the court as it was explained to him.  That there might exist some unknown, hypothetical situation in which man's law was in conflict with Mr. Chambers's understanding of Scripture does not mean that he was unable or unwilling to follow the law in a death-penalty case.[68]  Under these circumstances, the trial judge did not abuse his discretion in denying appellant's challenge for cause of Mr. Chambers.

## E.     Veniremember David Sanford

Appellant challenged Mr. Sanford for cause, arguing that the veniremember was unable to follow the law[69] and that he said, on his juror questionnaire, that he could not consider mitigation evidence.  But during the questioning by the attorneys, Mr. Sanford repeatedly said that he had an open mind and would follow the law; he could "be fair" and consider all of the evidence concerning both future dangerousness and mitigation.  Although he believed that a person who committed a

---

[67] *See Landry v. State*, 706 S.W.2d 105, 108 (Tex. Crim. App. 1985).

[68] *Compare id.* (trial court did not err in granting challenges for cause in capital murder case when two jurors expressed personal or religious scruples against death penalty, both jurors stated they believed death penalty to be inappropriate in most instances, and both jurors indicated that their personal beliefs, rather than the law, would guide them in answering special issues).

[69] During one discussion, Mr. Sanford said that he would "follow the law" although he believed that sometimes, even when people tell you what you may or may not consider, "that's the unfortunate part of being human.  Sometimes it's in our head, and while we're trying not to, we go back here and we make a decision that may have been influenced by that; then I think that's what– this is where, I guess, what I'm trying to say.  That's what the purpose of the jury is for.  So that 12 people that are in the community that think somewhat alike, live alike, can make that decision.  But those influences may be there, I will definitely try to follow that; but, I guess, what is in your head, I guess is in your head."  Mr. Sanford appeared to be referring to the unconscious mind and acknowledging that people do not always have conscious control over unconscious influences.  When a veniremember's answers are ambiguous or vacillating, it is the trial judge's duty to resolve the meaning of those statements and determine if the prospective juror could properly follow the law.  *See Colburn*, 966 S.W.2d at 517.

premeditated murder was a "good candidate" for the death penalty, he would listen to all of the evidence. In his juror questionnaire, Mr. Sanford said that he did not agree with the statement that "some people's circumstances, birth, upbringing, and environment should be considered to determine punishment." But, during questioning, he agreed that he could consider such evidence, even though he had answered the questionnaire honestly.

A juror is not required to consider any specific type of evidence or specific circumstances as either mitigating or aggravating, but he must be able to consider all evidence that he does find mitigating or aggravating in answering the special issues.[70] In this case, Mr. Sanford stated that he could consider evidence of birth, upbringing, and environment in assessing punishment, even though he did not personally find them relevant. More importantly, the law does not require him to consider these specifically enumerated types of evidence as either mitigating or aggravating.[71] The trial judge did not abuse his discretion in overruling appellant's challenge for cause of Mr. Sanford.

## F.      Veniremember Susan McMillan

After very short questioning of veniremember Susan McMillan, appellant simply announced "We challenge," without giving any reason for that challenge or stating whether it was intended as a challenge for cause or a peremptory challenge. Because appellant failed to describe what type of challenge he was exercising or the specific basis for a challenge for cause (if he intended a challenge

---

[70] *See Heiselbetz v. State*, 906 S.W.2d 500, 508-09 (Tex. Crim. App. 1995) (trial court did not err in denying challenges for cause; though potential jurors stated that they could not give certain specific types of evidence mitigating value, each stated that they could give effect to evidence that they did find mitigating); *Johnson v. State,* 773 S.W.2d 322, 330-31 (Tex. Crim. App. 1989) ("[I]t is not error for a trial court to overrule a challenge for cause where it is shown that a juror will not or may not give a particular variety of 'mitigating evidence' any consideration," i.e., weight).

[71] *Heiselbetz*, 906 S.W.2d at 508-09; *Johnson*, 773 S.W.2d at 330-31; *see also Joubert v. State*, 235 S.W.3d 729, 734 (Tex. Crim. App. 2007) ("A venireperson is not challengeable for cause on the ground that she does not consider a particular type of evidence to be mitigating.").

for cause), he failed to preserve any issue for appellate review concerning this veniremember.[72]

In sum, because appellant has not shown that the trial judge improperly denied at least two of his challenges for cause, his third point of error is without merit, and it is overruled.[73]

**G.     Veniremember Charles Perry**

In his fourth point of error, appellant argues that veniremember Perry was improperly disqualified from jury service by the trial judge because he had a prior Class C theft conviction for writing "bad checks." He claims that the State failed to prove that Mr. Perry was the same Charles Perry who had been convicted in 1981 of passing bad checks in Dallas. The State offered a four page DPS print-out of Mr. Perry's purported criminal record. That record contained Mr. Perry's date of birth and social security number. Mr. Perry stated that he lived in Dallas in 1981 and that he had written some checks to a Dallas bank when he did not have sufficient funds in his account, but that he thought that the matter was "resolved" because he had made restitution. Appellant agues that the DPS criminal record was not sufficiently reliable to establish that Mr. Perry actually had a final conviction for theft.

A person who has been convicted of, or who has a pending charge for, either misdemeanor or felony theft is absolutely disqualified as a juror.[74] But Article 35.19 does not require that the trial judge be certain about a veniremember's disqualification; he may disqualify a prospective juror if

---

[72] *Mathis v. State*, 67 S.W.3d 918, 922 (Tex. Crim. App. 2002) ("To preserve error on allegedly erroneously denied challenges for cause, an appellant must [*inter alia*] demonstrate that he asserted a clear and specific challenge for cause"); *Green v. State*, 934 S.W.2d 92, 105 (Tex. Crim. App. 1996) ("To preserve error for a trial court's denial of a valid challenge for cause, it must be demonstrated on the record that appellant asserted a clear and specific challenge for cause," among other requirements).

[73] *See Newbury v. State*, 135 S.W.3d 22, 31 (Tex. Crim. App. 2004); *Martinez v. State*, 763 S.W.2d 413, 415 (Tex. Crim. App. 1988).

[74] TEX. CODE CRIM. PROC. art. 35.16(a)(2) & (3); *see Nelson v. State*, 129 S.W.3d 108, 109 (Tex. Crim. App. 2004) (a veniremember who is absolutely disqualified under Art. 35.19 may not serve on a jury, even with both parties' consent).

it "appears" that the person is subject to disqualification under the statute.[75] The issue of whether a venireman is disqualified under the statute is one of fact; thus, if the evidence is conflicting, the trial judge does not abuse his discretion by finding either that the veniremember is or is not disqualified.[76] Although Mr. Perry did not affirmatively state that he had a theft conviction (he said that he had "resolved" the matter and made restitution), he did acknowledge the underlying factual information in the DPS record.[77] Appellant argues that DPS computer records are prone to error, but there is no evidence that this DPS record is erroneous. Mr. Perry did not dispute any of the facts in the DPS record; rather, he appeared to have not been aware of the legal consequences of the "resolved" charge, and he said that he "can write that down." The trial judge did not abuse his discretion in concluding from this information that Mr. Perry appeared to be absolutely disqualified to serve as a juror.[78] But even if Mr. Perry had been improperly disqualified by the trial judge, appellant failed to show that any error affected his substantial rights. Absent a showing of constitutional error, a defendant's rights are affected only by harm caused by jurors who served on the case, not by those excused from service.[79] There is no suggestion that the trial judge's

---

[75] *Chambers v. State*, 903 S.W.2d 21, 28 (Tex. Crim. App. 1995) ("[A]rticle 35.19 does not require undisputable certainty on the part of the trial court in making its determination on absolute disqualifications. Rather, article 35.19 provides that if it 'appears' that the venireperson is absolutely disqualified, then he 'shall not be empaneled[.]'" ).

[76] *Id*.; *see also Hammond v. State*, 799 S.W.2d 741, 744-45 (Tex. Crim. App. 1990) (stating that the finding of whether a juror is absolutely disqualified is "a question of fact to be resolved by the trial court in the first instance," and, if the evidence "'might be called conflicting,' a trial court has discretion to find, or for that matter refuse to find, facts such as would justify a challenge for cause.").

[77] The DPS record showed that Mr. Perry was arrested on August 27, 1981, for "passing worthless checks–theft." On December 1, 1981, he was sentenced to one day in jail.

[78] *Chambers*, 903 S.W.2d at 28; *Hammond*, 799 S.W.2d at 744-45.

[79] *See Jones v. State*, 982 S.W.2d 386, 391-94 (Tex. Crim. App. 1998) (an improperly granted challenge for cause is not constitutional error as long as the juror was not struck for discriminatory reasons [or because of general opposition to the death penalty]; thus, an

disqualification of Mr. Perry deprived appellant of a lawfully constituted jury, all of whose members were qualified to serve.[80]  We overrule appellant's fourth point of error.

### Jury Charge Claims

In two points of error, appellant claims that the jury charges at both the guilt and punishment stages contained error.

### A.     The Jury Charge at the Guilt Stage

In point of error eight, appellant claims that the jury charge at the guilt stage should have required the jury to unanimously decide whether he was liable for capital murder by shooting Tammy while committing the offense of burglary or of retaliation.  At trial, he objected and argued that the jury should be given two different verdict forms, one for murder in the course of burglary and the other for murder in the course of committing retaliation.  The State argued that, under *Kitchens v. State*,[81] burglary and retaliation were simply different manner and means to commit the single offense of capital murder: that is, murder committed during the course of any one of the enumerated felony offenses.

Appellant argues that *Kitchens* offers too simplistic an analysis and is outmoded under our more recent decisions, *Huffman v. State*[82] and *Landrian v. State,*[83] which focused upon the gravamen

---

improperly granted challenge for cause does not affect the defendant's substantial rights unless the error deprived him of a lawfully constituted jury).

[80] *Id.*

[81] 823 S.W.2d 256 (Tex. Crim. App. 1991).

[82] 267 S.W.3d 902 (Tex. Crim. App. 2008) (in prosecution of failure to stop and render aid, application paragraph properly charged three methods of violating the statute in the disjunctive because "failing to stop," "failing to return," and "failing to remain" were simply three different ways of committing offense). In *Huffman*, this Court explicitly reaffirmed *Kitchens*. *Id.* at 909.

[83] 268 S.W.3d 532 (Tex. Crim. App. 2008) (in aggravated assault prosecution, application paragraph properly charged alternate modes of committing offense, "by causing serious bodily injury" or "by using or exhibiting a deadly weapon," because gravamen of the offense was bodily

of the offense in determining whether the jury must be unanimous about alternative elements of the offense. These cases, however, are consistent with *Kitchens*, which implied that the gravamen of that capital murder was intentionally causing the death of a person while in the course of committing either aggravated sexual assault or robbery.[84] The jury did not need to be unanimous on which of the two underlying felonies the defendant was in the course of committing.[85] We have consistently followed the *Kitchen*s analysis in the context of capital murder jury charges: the gravamen of capital murder is intentionally (or knowingly) causing a death, plus any one of various different types of aggravating elements, and we most recently concluded "that our holding in *Kitchens* applies equally to all alternate theories of capital murder contained within [Penal Code] §19.03, whether they are found in the same or different subsections, so long as the same victim is alleged for the predicate murder."[86] *Kitchens* remains good law. The jury charge properly set out the underlying felonies of burglary and retaliation in the disjunctive, and the jury did not need to be unanimous concerning which felony appellant was in the course of committing. We overrule appellant's eighth point of error.

**B.     The Punishment Charge**

In point of error nine, appellant raises several complaints about the punishment jury charge. First, he claims that the punishment charge allowed for a nonunanimous verdict because (1) the trial

_____

injury assault).

[84] 823 S.W.2d at 257.

[85] *Id.*

[86] *Gamboa v. State*, ___ S.W.3d __, ___, No. AP-75,635, 2009 Tex. Crim. App. LEXIS 512, at *21 (Tex. Crim. App. April 8, 2009); *see also Luna v. State*, 268 S.W.3d 594, 600-01 (Tex. Crim. App. 2008) (following and applying *Kitchens* analysis when defendant pled guilty to committing capital murder alleged to have been committed during the commission of any one of three different felony offenses).

judge did not instruct the jurors that a hung jury would result in a life sentence; and (2) the statutorily mandated "12-10" instruction did not inform each juror that he could mandate a life sentence by refusing to reach a decision on the special issues. This Court has repeatedly rejected these claims,[87] and appellant's arguments do not persuade us to overrule our precedent.

Second, appellant asserts that the trial court erred in refusing to define the terms "probability," "criminal acts of violence," "militates," and "continuing threat to society." These terms are not statutorily defined; therefore, the jury should give them their commonly accepted meanings.[88] These claims have been rejected by this Court in prior cases, and appellant does not persuade us that those precedents should be overruled.[89]

Third, appellant claims that the trial court erred by failing to instruct the jury "so as to limit the scope of militating evidence to that which a juror might regard as increasing the defendant's moral blameworthiness."[90] The statutorily mandated language instructs the jury that it must consider "evidence of the defendant's background or character or circumstances of the offense that militates

---

[87] *See, e.g., Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Prystash v. State*, 3 S.W.3d 522, 532, 536-37 (Tex. Crim. App. 1999); *Patrick v. State*, 906 S.W.2d 481, 494 (Tex. Crim. App. 1995); *Nobles v. State*, 843 S.W.2d 503, 509-10 (Tex. Crim. App. 1992); *Davis v. State*, 782 S.W.2d 211, 211-12, 222 (Tex. Crim. App. 1989).

[88] *See Druery*, 225 S.W.3d at 509.

[89] *See Luna v. State*, 268 S.W.3d at 609 (future dangerousness special issue not unconstitutionally vague for failing to define "probability," "criminal acts of violence," or "continuing threat to society"); *Renteria v. State*, 206 S.W.3d 689, 706 (Tex. Crim. App. 2006) ("probability"); *Sells v. State*, 121 S.W.3d 748, 767-68 (Tex. Crim. App. 2003) ("probability"); *Murphy v. State*, 112 S.W.3d 592, 606 (Tex. Crim. App. 2003) ("probability," "criminal acts of violence," and "continuing threat to society"); *Martinez v. State*, 924 S.W.2d 693, 698 (Tex. Crim. App. 1996) ("militates").

[90] Appellant's Brief at 83.

for or mitigates against the imposition of the death penalty."[91]  We have previously held that this instruction requires the jury to look at all of the evidence and not just evidence that a juror might find mitigating.[92]  Appellant argues that the charge failed to preclude the jury from "giving weight to factors beyond Appellant's control"[93] that might militate in favor of the death penalty.  But appellant fails to explain what factors were both beyond his control and did not increase his moral culpability that the jury should have been prohibited from considering.[94]  Absent a showing of "some harm" by the use of the statutorily mandated language in the special issue, appellant's claim must be rejected.[95]

Fourth, appellant claims that the trial judge erred by refusing to instruct the jury on a presumption in favor of a life sentence even if it answered "Yes" to the future dangerousness question.  Appellant fails to cite to any such presumption in Texas law, and he cites no federal precedent that would require the giving of such an instruction.  He cites *Caldwell v. Mississippi*,[96] but that case simply notes the "Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'"[97]  That heightened

---

[91] TEX. CODE CRIM. PROC. art. 37.071, § 2(d)(1).

[92] *Luna v. State*, 268 S.W.3d at 610; *Scheanette v. State*, 144 S.W.3d 503, 507-08 (Tex. Crim. App. 2004).

[93] Appellant's Brief at 84-85.

[94] *King v. State*, 953 S.W.2d 266, 274 (Tex. Crim. App. 1997) (rejecting claim that definition makes mitigation issue unconstitutional because it limited consideration of evidence to those facts that bore upon moral blameworthiness when defendant failed to specify what evidence he presented that jury was prohibited from considering).

[95] *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).

[96] 472 U.S. 320 (1985).

[97] *Id*. at 323.

reliability is achieved by the Texas statutory scheme with its special issues and its mandatory instructions to the jury.[98]  The trial judge did not err in declining to instruct the jury on a non-existent,  non-statutory presumption.

Having rejected all of appellant's claims concerning the sufficiency of the punishment jury instructions, we overrule his ninth point of error.

### The State's Jury Argument

In his tenth point of error, appellant claims that the prosecutor misstated the law and told the jury that it could impose a death sentence based solely on the facts of the capital murder.  In context, however, the State's argument appears to have been proper.  During closing argument, the prosecutor explained the process of deciding the two special issues:

> And so how do you go about making this decision?  How do you go making–go about making and determining the answers to these Special Issues of whether or not this defendant is a future danger and whether or not this defendant deserves a life sentence or a death sentence?
> We look at a few things here.  First of all, you look at the crime.  And, if you remember, we talked about that, that you can have a situation where a defendant commits such a heinous capital murder he can be sentenced to death based on those facts alone.  So you look at the crime and then you look at the criminal.  And you've got plenty of evidence before you . . . .

Appellant objected that this was a misstatement of the law, and the trial judge overruled that objection.  Later, the prosecutor argued:

> So you look at that crime, and then you look at this criminal.  And you heard a little bit from his sister about his background, and you heard a little bit about it from these people that he worked with about his background.  And that's stuff that you can consider for the second Special Issue.

---

[98] *See* TEX. CODE CRIM. PROC. art. 37.071; *Jurek v. Texas*, 428 U.S. 262, 276 (1976) (upholding Texas capital-sentencing procedure).

Appellant acknowledges that this Court has repeatedly said that, if the circumstances of the case are sufficiently cold-blooded or calculated, then those facts alone may support a finding of future dangerousness.[99]  The prosecutor's argument concerning the facts of the crime being sufficient to support a finding of future dangerousness was a proper one, and he did not urge the jury to ignore the second special issue, the mitigation question.  Instead, he told them to look first to the crime (the first special issue of future dangerousness) and then to the criminal (the second special issue concerning mitigation).  Although it is possible to construe this argument as being improper when taken out of its full context, the prosecutor's argument is more naturally interpreted as a permissible one.[100]  Even if it could be viewed as improper, it was not so manifestly improper to constitute reversible error.[101]

We overrule appellant's tenth point of error.

**Motion for New Trial Hearing**

In his eleventh, and final, point of error, appellant claims that the trial court erred by failing to conduct a hearing on his motion for new trial.  Appellant timely filed his motion and asserted facts that were not in the record.[102]  Appellant's counsel also attached a "Certificate of Presentment"

---

[99] *See, e.g., Guevara v. State*, 97 S.W.3d 579, 581 (Tex. Crim. App. 2003); *Hayes v. State*, 85 S.W.3d 809, 814 (Tex. Crim. App. 2002); *Barnes v. State*, 876 S.W.2d 316, 322-23 (Tex. Crim. App. 1994).

[100] *See, e.g., Cantu v. State*, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997) (viewed in context, prosecutor's argument was not a misstatement of the law).

[101] *Id.* (inferences drawn by the prosecutor were not so extreme or improper as to rise to the level of reversible error).

[102] He attached an affidavit by his investigator in which she stated,
    During the punishment phase of trial with the jury still present in the courtroom
    and just prior to the jury being sent to deliberate, I heard the court [make] a

stating that a copy of his motion would be hand-delivered to the trial court.  Unfortunately, there is

no indication in the record that the motion for new trial was, in fact, hand-delivered to the trial judge.

There is no indication in the record that the trial judge ever saw the motion, and it was overruled by

operation of law.[103]  Furthermore, appellant never asked for a hearing on his motion for new trial.

A motion for new trial must be "presented" to the trial court within ten days of being filed.[104]

The defendant must put the trial judge on actual notice that he desires the judge to take some action,

such as making a ruling or holding a hearing, on his motion for new trial.[105]  "Presentment" must be

apparent from the record, and it may be shown by such proof as the judge's signature or notation on

the motion or proposed order, or an entry on the docket sheet showing presentment or setting a

hearing date.[106]  There is nothing in the present record that demonstrates that appellant ever presented

his motion personally to the trial judge, much less presented it in a timely manner.  His certificate

in which he indicated that he intended to present it does not suffice to show that he actually did do

so or when he did so.

---

comment in reference to the jury's deliberations and utter the phrase, "I do not expect this will take long."

[103] *See* TEX. R. APP. P. 21.8.

[104] T EX. R. APP. P. 21.6.

[105] *See Stokes v. State*, 277 S.W.3d 20, 21 (Tex. Crim. App. 2009) ("The purpose of the presentment rule is 'to put the trial court on actual notice that a defendant desires the trial court to take some action on the motion for new trial such as a ruling or a hearing on it.'").

[106] *Id.* at 22; *see also Carranza v. State*, 960 S.W.2d 76, 79 (Tex. Crim. App. 1998) ("[T]he record must show the movant for a new trial sustained the burden of actually delivering the motion for new trial to the trial court or otherwise bringing the motion to the attention or actual notice of the trial court.  This may be accomplished in several ways such as, for example, obtaining the trial court's ruling on a motion for new trial.").

At oral argument, appellant's counsel noted the difficulties of appearing in person in the various courts across the state to hand-deliver a motion for new trial to the trial judge and obtain documentary proof of that event.  The Rules of Appellate Procedure do not require a personal visit, but they do require some documentary evidence or notation that the trial judge personally received a copy of the motion and could therefore decide whether to set a hearing or otherwise rule upon it.[107] Thus, without any showing that the trial judge actually saw appellant's motion for new trial, the judge cannot be faulted for failing to conduct a hearing on that motion.[108]

Further, appellant did not request a hearing on his motion for new trial.  Although the motion contains a document titled "Order for a Setting," that document does not suffice as a request to hold a hearing on the motion.[109]  As we recently held, "a reviewing court does not reach the question of whether a trial court abused its discretion in failing to hold a hearing if no request for a hearing was presented to it."[110]

Because appellant did not show that he timely presented his motion for new trial to the trial judge or that he requested a hearing on that motion, the trial judge did not abuse his discretion in

---

[107] TEX. R. APP. P. 21.6 ("The defendant must present the motion for new trial to the trial court within 10 days of filing it, unless the trial court in its discretion permits it to be presented and heard within 75 days from the date when the court imposes or suspends sentence in open court."); *see Stokes*, 277 S.W.3d at 21.

[108] *See Carranza*, 960 S.W.2d at 79-80.

[109] *See Rozell v. State*, 176 S.W.3d 228, 231 (Tex. Crim. App. 2005) ("The order attached to the motion [for new trial], labeled "Order-Time to Present," included the options of having a hearing or ruling on the motion without a hearing, which, without a more specific request, left to the trial court's discretion whether a hearing should be held.  We hold that, in this case, the appellant did not adequately advise the trial court of his desire to have a hearing.").

[110] *Id.* at 230.

failing to conduct a hearing on that motion.[111]   Appellant's eleventh point of error is overruled.

Having found no reversible error, we affirm the judgment of the trial court.

Delivered: October 21, 2009

Publish

---

[111] *See Stokes*, 277 S.W.3d at 21; *Rozell*, 176 S.W.3d at 231.