

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
### NO. AP-77,029
---

**JAMES HARRIS, JR., Appellant**

**v.**

**THE STATE OF TEXAS**

---
### ON DIRECT APPEAL FROM CAUSE NO. 67063
### IN THE 149TH JUDICIAL DISTRICT COURT
### BRAZORIA COUNTY
---

JOHNSON, J., delivered the opinion of the Court in which MEYERS, KEASLER, HERVEY, ALCALÁ, RICHARDSON, YEARY, and NEWELL, JJ., joined. KELLER, P.J., concurred.

### O P I N I O N

In November 2013, a jury convicted appellant of capital murder for the January 2012 stabbing death of Alton Wilcox in the course of committing or attempting to commit burglary of a habitation or robbery.[1] *See* TEX. PENAL CODE § 19.03(a)(2). Pursuant to the jury's answers to the

---

[1] Appellant pleaded guilty to the indictment in front of the jury, and it returned an instructed verdict of guilty. *See In re State ex rel. Tharp*, 393 S.W.3d 751, 757 (Tex. Crim. App. 2012) ("[A] plea of guilty to a jury eliminates guilt as an issue to be determined and makes it 'proper for the trial judge in his charge to instruct the jury to return a verdict

(continued...)

special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. TEX. CODE CRIM. PROC. Art. 37.071, § 2(g).[2] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). Appellant raises ten points of error. After reviewing appellant's points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

## Improper Impeachment

In point of error one, appellant alleges that the trial court abused its discretion in allowing the State to impeach the testimony of defense expert witness Dr. Raymond Singer, a neuro-psychologist and neuro-toxicologist, with examples of cases in which other courts had excluded Singer's testimony.[3] Appellant notes that, at a hearing outside the jury's presence, the trial judge found Singer to be qualified as an expert and found that his opinion testimony was admissible. Appellant asserts that the trial judge therefore necessarily found that Singer's proposed testimony was sufficiently relevant and reliable to assist the jury. Appellant argues that it was accordingly improper for the trial judge to allow the State to attack Singer's qualifications and the reliability of his opinion when it cross-examined Singer in front of the jury.

Texas Rule of Evidence 702 governs the admission of expert testimony.[4]

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific,

---

[1](...continued)
of guilty, charge the jury on the law as to the punishment issues and then instruct them to decide only those issues.'").

[2] Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.

[3] In his testimony before the jury, Singer testified about his professional qualifications and the basis for his opinion that appellant had a major neuro-cognitive disorder due to exposure to toxic substances.

[4] Unless otherwise stated, future references to "Rules" in this opinion denote the Texas Rules of Evidence.

technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

"The party proffering the expert witness bears the burden of showing that the witness is qualified on the specific matter in question." *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000) (internal quotation marks omitted). Under Rule 705, even if an expert is qualified for purposes of Rule 702, the expert's opinion is not admissible if the underlying facts or data do not provide a sufficient basis for the opinion. *See* Rule 705(c). In a criminal case, the adverse party must be permitted to examine the expert outside the jury's hearing about the underlying facts or data before the expert states an opinion or discloses the underlying facts or data. *See* Rule 705.

In *Kelly v. State*, 824 S.W.2d 568, 572–73 (Tex. Crim. App. 1992), we adopted several procedural and substantive limitations upon the admission of expert scientific testimony to ensure that unreliable expertise would be excluded from the jury's consideration. *Coble v. State*, 330 S.W.3d 253, 273 (Tex. Crim. App. 2010). In pertinent part, upon request, a trial judge must conduct a "gatekeeping" hearing outside the jury's presence to determine whether the proponent's scientific evidence is sufficiently reliable and relevant to help the jury in reaching an accurate result. *Id*.

The record of the hearing shows that trial counsel elicited testimony from Singer concerning his professional qualifications and experience in neuropsychology and neurotoxicology, including his experience testifying in court as an expert witness in those fields. Trial counsel also elicited testimony concerning the facts or data on which Singer relied in forming the opinion that appellant "suffers from brain injury from exposure to numerous toxic substances, . . . resulting in major cognitive disorder."

When the prosecutor cross-examined Singer, she also questioned him about his professional

qualifications and experience, as well as the facts or data underlying his opinion. When the prosecutor inquired into his experience as an expert witness, Singer acknowledged that there had been four occasions on which courts had excluded his expert testimony. However, Singer disputed the prosecutor's assertion that those courts had excluded his testimony based on a finding that it was not scientifically reliable.

After the prosecutor's voir dire, trial counsel argued that Singer was qualified to testify as an expert witness in neuropsychology and neurotoxicology. Trial counsel asserted that Singer's testimony was admissible, arguing that "[t]he fact that his testimony has been excluded several times I don't think is a bar to him testifying here." Trial counsel also asked that, if the trial judge found Singer's testimony to be admissible, that he preclude the prosecutor from cross-examining Singer about cases in which other courts had excluded his testimony. Alternatively, trial counsel asked for a motion in limine requiring the parties to approach the bench before the prosecutor engaged in any such questioning. In support, trial counsel asserted that "from a 403 standpoint, . . . we would have to approach and have a balancing test" and that cross-examination by the prosecutor on the other cases would be "basically going behind this Court's ruling saying that [Singer's] qualified to testify." Trial counsel elaborated, "If this Court says he's qualified in this 705 ruling, what they are doing is going behind this ruling and bringing another court to say, yeah, but this court said something different. It's almost like it's impeaching this Court's decision, and that's improper . . . ."

The prosecutor thereafter provided the trial judge and trial counsel with copies of court opinions from the cases she had referred to when cross-examining Singer. Following a recess, the trial judge heard additional argument from the parties on the admissibility of Singer's testimony and the proper scope of the prosecutor's cross-examination if Singer testified before the jury. The trial

judge ruled on both issues.

> THE COURT:[5]  I'm going to go ahead and allow him to testify to the limited basis that he's said he's qualified to attest to and to the things that he testified to during this 705 examination.  I think the magnitude of the case would require me to allow that to be brought in.  But the defense [sic] is entitled to test his qualifications with regard–I'm sorry.  I am looking at you.

> [Prosecutor]:  We're to the point where we could swap.

> THE COURT:  You can go into prior cases where he has been found to be not qualified.  Because some of this language in these cases is pretty pointed as to going to his qualifications to give toxicology-type opinions.

> But I will allow him to testify, but I will allow the State to go in on cross-examination to those other issues.

> [Trial counsel]:  Yes, Judge.  And for the record, we would object.

> THE COURT:  I understand, and your objection is overruled.

> * * *

> [Trial counsel]:  Judge, for the record, not to argue with your ruling in any way.  I'd just like to federalize my objection.

> THE COURT:  You may do that, and then I'll rule on it.

> [Trial counsel]:  Thank you, Judge.

> The 4th, 5th, 14th Amendments of the United States Constitution; Article 1, Sections 3, 10, 13, 15 and 19 of the Texas Constitution.  And we would renew our objection based on those.

> THE COURT:  All right.  And those objections will be overruled.

The trial court's implicit determination, that Singer's testimony was sufficiently reliable and

relevant to be admissible, did not preclude the State from challenging Singer's credibility when he

---

[5]  The punctuation that is used after the identity of the speaker is consistent with the record.  When the parties and the trial judge were talking among themselves, the court reporter used a colon.  When the one of the parties  was questioning a witness, the court reporter used a period.

later testified in front of the jury.[6]  At the gatekeeping hearing, the focus of the "reliability" analysis "is to determine whether the evidence has its basis in sound scientific methodology[,] such that testimony about 'junk science' is weeded out." *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *see Vela v. State*, 209 S.W.3d 128, 135–36 (Tex. Crim. App. 2006) ("[R]eliability focuses on the subject matter of the [expert] witness's testimony.").  "This demands a certain technical showing." *Vela*, 209 S.W.3d at 133.  "Relevance" for purposes of the gatekeeping hearing "refers to the 'fit' of the scientific principles to the evidence at hand." *Everitt v. State*, 407 S.W.3d 259, 263 (Tex. Crim. App. 2013).  An expert witness's credibility is a distinct issue and determination belonging to the jury.  *See* Art. 38.04 (stating that the jury is the exclusive judge of the facts proved and of the weight to be given to the testimony); *Vela*, 209 S.W.3d at 135–36 ("[C]redibility and reliability are not the same.  A jury should evaluate credibility[.]").  Point of error one is overruled.

**Jury Charge Error**

In point of error two, appellant alleges that the trial court erred by including language in the jury charge stating that it had found him competent and sane.

> To this charge [of capital murder] the defendant has pleaded "GUILTY" and he has persisted in entering such plea notwithstanding the Court, as required by law, had admonished him of the consequences of the same; and it plainly appearing to the Court that the defendant is competent and sane and that he is not influenced to make this plea by any consideration of fear, nor by a persuasive or delusive hope of pardon prompting him to confess his guilt, said plea is by the Court received.

---

[6]  Although the record shows that the trial judge referred to Singer's testimony at the hearing as a "705 examination," and that trial counsel referred to the judge's ruling as a "705 ruling," it appears that this terminology was merely a convenient shorthand.  Our review shows that the hearing also addressed relevant issues under Rule 702 and *Kelly*, including whether Singer was qualified to testify as an expert and whether his testimony was sufficiently reliable and relevant to meet *Kelly*'s minimum threshold for admissibility.  *See Coble*, 330 S.W.3d at 273.

Appellant contends that the language "the defendant is competent and sane" was a comment on the weight of the evidence regarding his mental condition and therefore error under Article 36.14.[7] Appellant asserts that the error harmed him because his punishment theory was that the environment in which he grew up and worked, plus his habitual drug use, affected his mental capacity to such an extent that it mitigated against the imposition of the death penalty.

Our opinion in *Morin v. State,* 682 S.W.2d 265 (Tex. Crim. App. 1983), undermines appellant's argument. In *Morin*, the defendant pleaded guilty to an indictment charging him with capital murder. 682 S.W.2d at 266. The trial proceeded in a bifurcated manner. *See id.*; *see also Holland v. State*, 761 S.W.2d 307, 313 (Tex. Crim. App. 1988) (when a defendant in a capital case pleads guilty, the proceeding that ensues may be either "bifurcated" or "unitary"). That is, the trial court first gave the jury a charge that instructed it to return a guilty verdict. *See Morin*, 682 S.W.2d at 267. After the jury complied with the trial court's instruction to return a guilty verdict, evidence was heard at the punishment phase of trial. *See id*. Pursuant to the jury's answers to the special issues, the trial court sentenced the defendant to death. *Id*.

The charge given at the guilt phase of *Morin* was similar to the one given in appellant's case. In addition to instructing the jury to return a guilty verdict, the charge stated that: the defendant had pleaded guilty to the indictment; the defendant was mentally competent; the plea had been made freely and voluntarily; and the trial court had received the plea. *Id*. at 268. We stated that the guilt-phase charge in that case "show[ed] compliance with Art. 36.14 in that the jury was given instruction on the law, applicable to the case, without comment on the weight of the evidence." *Id*. at 268–69.

---

[7] In pertinent part, Article 36.14 requires the trial court to deliver a written charge to the jury that "distinctly set[s] forth the law applicable to the case" without "expressing any opinion as to the weight of the evidence . . .."

Appellant's case differs from *Morin* in that appellant's trial was a unitary proceeding in which the jury received "a combination instructed verdict and charge on punishment." *See Holland*, 761 S.W.2d at 313. However, in *Holland*, we rejected the contention that a combination instructed verdict on guilt and charge on punishment is inherently erroneous because it somehow encourages jurors to return the death penalty. *See id.* at 313–14 (rejecting the argument that a combination instructed verdict on guilt and charge on punishment "places the question of absolute guilt more in the minds of the jury as they deliberate since they have been ordered in the same document to find [the defendant] guilty") (internal quotation marks omitted). Without more, the fact that the language of which appellant complains appeared in a combination instructed verdict on guilt and charge on punishment does not persuade us that we should reach a different conclusion than we reached in *Morin*. Point of error two is overruled.

## Challenges for Cause

In points of error three through six, appellant alleges that the trial court erroneously denied his challenges for cause to potential jurors Brenda Woods, Stephanie Cooper, Brenda Lee, and Donna Vanscoy. He contends that these prospective jurors possessed a bias against the law that would substantially impair their ability to assess punishment in accordance with the law and evidence.

In *Comeaux v. State*, 445 S.W.3d 745, 749–50 (Tex. Crim. App. 2014), we discussed the prerequisites to obtaining relief on a claim that the trial court erroneously denied the appellant's challenge for cause. *See also Johnson v. State*, 43 S.W.3d 1, 6 (Tex. Crim. App. 2001). In addition to demonstrating error by the trial court, the appellant must show on the record that (1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge on the complained-of

venire member; (3) his peremptory challenges were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury. *Comeaux*, 445 S.W.3d at 750.

Here, the record shows that appellant exhausted his fifteen statutory peremptory strikes, using his fifth, sixth, seventh, and eighth peremptory strikes to remove Woods, Cooper, Lee, and Vanscoy after the trial court denied his cause-based challenges to them. When appellant used his fifteenth and last statutory peremptory strike to remove Juror Number 172, eleven jurors had been seated.

Appellant unsuccessfully challenged the next prospective juror, Michael Martinez, for cause. Immediately after the trial court denied appellant's challenge for cause to Martinez, trial counsel filed a written motion in which he requested twelve additional peremptory strikes.[8]

In the argument on the motion that followed, trial counsel stated that he would use one of the additional peremptory strikes against Martinez, whom he identified as an objectionable juror. The trial court denied appellant's request for additional peremptory strikes, and it seated Martinez as the twelfth juror.

A defendant may challenge a venire member for cause when he or she is alleged to be biased or prejudiced against the defendant or the law on which the State or defendant is entitled to rely. *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009); *see* Art. 35.16(a)(9), (c)(2). A trial court must excuse the venire member if such a bias or prejudice would substantially impair the juror's ability to carry out his oath and instructions in accordance with the law. *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002). But before the judge excuses a potential juror for cause, the law must be explained to the juror. *Gardner*, 306 S.W.3d at 295. The proponent of the

---

[8] During the argument on the motion that immediately followed, trial counsel orally amended the motion to request only eleven additional strikes, on the grounds that the trial court had erroneously denied eleven earlier challenges for cause made by appellant.

challenge for cause bears the burden of establishing that the challenge is proper. *Id.* The proponent does not meet this burden until he has shown that the venire member understood the law's requirements and could not overcome his or her prejudice well enough to follow the law. *Id.*

When reviewing a trial court's decision to deny a challenge for cause, we look to the entire record to determine whether sufficient evidence exists to support the court's ruling. *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010). We reverse only for a clear abuse of discretion. *Id.* Because the trial judge is in the best position to evaluate a potential juror's demeanor and responses, we review a trial court's ruling on a challenge for cause with considerable deference. *Gardner*, 306 S.W.3d at 295; *see Burks v. State*, 876 S.W.2d 877, 893 (Tex. Crim. 1994) (trial judge is in the best position to determine whether a venire member will set aside his views and honestly and truthfully follow the juror's oath). When a prospective juror's answers concerning his ability to follow the law are vacillating, equivocating, ambiguous, unclear, or contradictory, we accord particular deference to the trial court's decision. *Gardner*, 306 S.W.3d at 295; *Moore v. State*, 999 S.W.2d 385, 400, 407 (Tex. Crim. App. 1999).

*Woods*

In point of error three, appellant contends that Woods was challengeable for cause because, if she found a defendant guilty of capital murder beyond a reasonable doubt, her strong belief in the death penalty would dictate her answers to the special issues, rather than the law and evidence. More specifically, appellant alleges that Woods would answer "yes" to the future-dangerousness special issue based on her personal beliefs about capital-murder defendants in general, rather than the law and evidence in this case. He further asserts that "she was a disabled juror in regards to her personal beliefs when it came to answering the mitigation special issue."

During questioning by the prosecutor, Woods expressed the belief that death could be an appropriate penalty for capital murder. However, Woods denied that she would automatically conclude that death was the appropriate sentence just because the jury had found a defendant guilty of capital murder. Woods indicated that she understood the future-dangerousness special issue and the State's burden of proof and that she would hold the State to its burden. She further stated that she could continue to "keep an open mind" concerning the appropriate punishment if the jury found the defendant to be a future danger. Woods indicated that she understood the mitigation special issue, could consider the different types of evidence that might be presented in mitigation of punishment, and could answer "yes" to the mitigation special issue if she found the evidence sufficiently mitigating to warrant a sentence of life without parole.

When trial counsel questioned Woods, he asked her to describe her "feelings" or "opinion" about the statement that "anyone convicted of Capital Murder should get the death penalty." Woods answered that she "would have to hear all the facts of the case" and that she could agree or disagree with the statement "depending on the facts." Trial counsel then asked Woods what her feelings would be if there were no legal justifications or excuses for the capital murder. Woods responded that she thought the statement "would be [an] accurate" description of her feelings under those circumstances. But Woods later clarified that she did "not necessarily" think the death penalty was the appropriate punishment for every capital murder "[b]ecause there could be . . . another whole side [besides legal defenses] to why that crime was committed. You know?"

When trial counsel subsequently questioned Woods about her ability to answer the future-dangerousness special issue according to the law and evidence, Woods initially stated that she could keep an open mind. In response to follow-up questioning, Woods appeared to grow confused and

asked trial counsel for "a better example." Questioning continued, leading to the following exchange.

> [Trial counsel]: . . . Can you envision yourself, . . . knowing that somebody has committed Capital Murder, can you answer [the future-dangerousness] Special Issue? Can you envision yourself being able to answer that Special Issue no?
>
> [Woods]. I would have to answer yes.
>
> [Trial counsel]. Okay. And that's based on your belief system?
>
> [Woods]. Yes.
>
> * * *
>
> [Trial counsel]. Now you understand that the law would require you to be able to answer that either way, yes or no, to be a qualified juror for a Capital Murder. Are you telling me that you will have to answer yes?
>
> [Woods]. I wasn't really clear. Because that's why I asked you for the example.

Trial counsel explained that he could not tell her the circumstances of the instant capital-murder case, and that he was trying to make the point that it would not be fair to appellant if she could only answer the future-dangerousness special issue "one way."

He then expressed his understanding that, when Woods had stated, "I would have to answer yes," she had meant that she would always answer "yes" to the future-dangerousness special issue. The prosecutor objected that trial counsel had mis-characterized the question that had led to Woods's answer. The trial judge stated that he thought Woods had conveyed "some confusion in her answer" and suggested that trial counsel ask the question again.

> [Trial counsel]. Okay. Now if you have found a defendant guilty of Capital Murder, which as we know is the death of another person by violence, if you found that defendant guilty of Capital Murder, can you envision yourself answering Special Issue No. 1 no?

* * *

[Woods]. I would have to say that from the evidence, and without hearing the evidence, that I would have to be open until I hear all the evidence.

[Trial counsel]. Okay. And based–based on that, are you saying to me that you can envision yourself answering that question no?

[Woods]. I can answer yes or no.

When trial counsel questioned Woods about the mitigation special issue, she stated that she could consider and give effect to various kinds of mitigating evidence, including evidence of low intellectual functioning, drug addiction, and brain damage. Woods stated that "[i]t could be either/or" as far as whether such evidence could lead her to find that there was a sufficient mitigating circumstance, such that the answer to the mitigation special issue should be "yes."

At the end of Woods's voir dire, trial counsel challenged her for cause. Trial counsel argued that Woods had agreed that the only appropriate punishment for capital murder was death, which showed that she lacked an open mind. Although trial counsel acknowledged that Woods had been confused when he questioned her about her ability to answer to the future-dangerousness special issue, he asserted that she had "seemed to say definitively, at least at one point" that her answer to the future-dangerousness special issue would always be "yes." Trial counsel argued that, although Woods had later "conformed herself," her earlier answer had reflected her true feelings on the matter. The trial court denied the challenge based on the totality of Woods's voir dire.

Woods's entire voir dire contains sufficient evidence to support the trial court's ruling. *Davis*, 329 S.W.3d at 807. To the extent Woods sometimes gave ambiguous, unclear, or contradictory answers concerning her ability to follow the law, we accord particular deference to the trial court's decision. *Gardner*, 306 S.W.3d at 295; *Moore v. State*, 999 S.W.2d 385, 400, 407 (Tex. Crim. App. 1999). Further, the trial judge was in the best position to evaluate Woods's demeanor

and responses. *See Davis*, 329 S.W.3d at 807. Point of error three is overruled.

*Cooper*

Appellant alleges in point of error four that Cooper was challengeable for cause because, during her individual voir dire, she "demonstrated a deep religious belief which would prevent her from properly considering mitigation in the punishment phase of the trial." He acknowledges that Cooper "stated several times that she could be fair and could consider the alternatives," but he contends that it was "not . . . logical to believe that she would be able to set [her religious and personal views] aside[.]"

During her voir dire by the prosecution, Cooper unequivocally stated that she understood the law regarding the special issues, and that she could set aside her personal beliefs and answer those issues according to the law and evidence. Under questioning by trial counsel, Cooper agreed that she had stated on her juror questionnaire that "[i]f there is definite proof the Defendant took a life, then he or she should pay with his or her life."

> [Trial counsel]. And my understanding of that is that based on your beliefs about God and I'm assuming the Bible–
>
> [Cooper]. Right.
>
> [Trial counsel]. –that part of that is–belief is based on the law, this biblical law that–you know, an eye for an eye?
>
> [Cooper]. Right.
>
> [Trial counsel]. If you kill somebody, then you pay with your own life?
>
> [Cooper]. Right.
>
> [Trial counsel]. And that would be the normal sort of punishment–or the normal sort of a first response in your belief system?

[Cooper]. It would be my first response, but I'm not an attorney and not completely skilled in the nuances of the law. So I mean, I feel like I could, you know, when the law is presented to me and if I were asked to consider options, I could follow it.

[Trial counsel]. Okay. If somebody asked you to violate your own conscience and to do something that's opposed to what you truly believe, how can you do that?

[Cooper]. When I was answering that question, really the kind of things that were running through my mind [were], you know, if someone that I loved was killed or someone that I knew was killed; and that always is much more personal than–unfortunately, it's more personal than, you know, just another individual in your hometown or whatever.

The Bible says an eye for an eye, but it also–you know, Jesus also said if someone strikes you once, then turn the other cheek, too. So I think I could consider all the options in front of me and really weigh the information before making a judgment on someone else's punishment.
[Trial counsel]. So you think you can do that?

[Cooper]. Yes.

After further questioning, trial counsel returned to the effect of Cooper's personal beliefs on her ability to answer the special issues according to the law and evidence.

[Trial counsel]. . . . [A]re you telling me that you've had lifelong beliefs that are probably reflected in your questionnaire and you're able to just set all that aside?

[Cooper]. Yeah. I would think that in the questionnaire lots of questions were asked, even about the types of television programs and things like that. And I am a fan of crime drama and I do watch the news, but I also think that people who play the role of murderer in a crime drama or people who are portrayed in the media or in a murder trial are also portrayed in a certain way with a certain slant. And one of the things that gave me pause in this–because, again, I've never sat on a criminal jury before–was actually having Mr. Harris in the courtroom. You know, you can't just walk down the street and know if someone has committed a crime or not; and you can't judge a book by its cover. So it couldn't be fair to make judgment on him until I've heard everything in the case and then follow the law as it has been presented.

[Trial counsel]. And it's really important to be fair?

[Cooper]. Yes.

At the conclusion of Cooper's individual voir dire, trial counsel challenged her for cause on several bases. In relevant part, trial counsel argued that Cooper "strongly believe[d] in an eye for an eye. She did consider herself to be a religious person. She does have a basis in her personal and religious beliefs for the death penalty." The trial judge denied the challenge, stating that "throughout her questioning I think [Cooper] made it very clear that she could consider everything" and that "given the totality of the answers" and by "the way she dealt with the questionnaire, the Court believes that she could be fair."

The trial court did not abuse its discretion by overruling appellant's challenge for cause to Cooper. The totality of her voir dire shows that Cooper repeatedly stated that she could set aside her personal beliefs and answer the special issues according to the law and evidence. The trial judge was entitled to believe her, and we defer to that belief. *See Gardner*, 306 S.W.3d at 295; *Burks*, 876 S.W.2d at 893. Point of error four is overruled.

*Lee*

In point of error five, appellant alleges that Lee was challengeable for cause because she would not disregard an illegally obtained confession; she had a strong personal belief "i[n] giving a death penalty as punishment for a capital murder offense"; and she "was an impaired juror in regards to finding and considering mitigating evidence which was presented at trial." He contends that the trial court therefore abused its discretion in denying the challenge.

After the prosecutor explained the law governing confessions to Lee, she indicated that she understood the procedural safeguards that the law provided regarding confessions and expressed her belief that such safeguards were important. The prosecutor thereafter gave Lee a series of hypotheticals probing her ability to comply with a trial court's instruction to disregard a confession

if she found that it was involuntary or that the police had disregarded a procedural safeguard in obtaining it. In response, Lee agreed that "the end [did not] justify the means" and that the State "[d]efinitely" should not be permitted to do something illegal, especially when lives were at stake. The prosecutor then gave Lee two final hypotheticals regarding confessions.

> [Prosecutor]. . . . You're sitting in that jury room and you've . . . listened to the confession. Ugly, gory details. Killing the victim, enjoying it, no justification, no excuse, no self-defense. Cold-blooded killing. You've heard it. The cat's out of the bag. All right? But you believe the police did not comply. An essential warning was clearly left off, or it was involuntary. Can you wholly disregard the statement and confession and not consider it for any purpose?
>
> [Lee]. Yes, ma'am.
>
> [Prosecutor]. Okay. . . . Let's say that confession was the piece of evidence that got me beyond a reasonable doubt. It's serious because wholly disregarding it, if I don't meet my burden of proof–because you have honestly had to wholly disregard it–
>
> [Lee]. Yes, ma'am.
>
> [Prosecutor]. –can you find someone not guilty?
>
> [Lee]. Yes, ma'am.
>
> [Prosecutor]. Okay. I'm not saying it's pleasant. But can you do that?
>
> [Lee]. I can.

When the prosecutor explained the special issues, Lee indicated that she understood how they operated and that, if she found a defendant guilty of capital murder, she would not automatically determine that death was the appropriate sentence. Lee, who stated that she took the prospect of jury service "very seriously," asserted that she would begin the punishment phase with an open mind regarding the answer to the future-dangerousness special issue. Lee also repeatedly asserted that, even if she answered the future-dangerousness issue "yes," she would maintain an open mind and

honestly consider all the evidence in answering the mitigation special issue.

When questioned by trial counsel, Lee confirmed that she had twice before served on a jury. Lee described her prior jury service as a positive experience, explaining that "the people I served with did try to take in effect only the facts that were presented in the courtroom itself and they also tried to be very fair and tried to examine it from both sides."

In response to questions concerning her personal beliefs about capital punishment, Lee expressed nuanced views. Lee repeatedly asserted that, although she believed the death penalty should be available as a potential punishment for capital murder, she did not necessarily believe that a death sentence was the appropriate punishment in every such case. For example, Lee stated that she did not think the death penalty would be appropriate when "there were circumstances that could lessen the severity of the crime." Lee also stated that she would not do away with the future-dangerousness special issue if she had the opportunity to change the law. She explained, "It makes you ask that one more question. It makes you go that one more step," which she thought was important because "nothing should be ever taken lightly or without looking at issues when you get to this point. I mean, you hold things in your–the balance in your hand, and you have to be able to consider all the issues."

When trial counsel pressed her on whether she could ever honestly answer "no" to the future-dangerousness special issue, Lee responded, "I think I could, you know, depending upon what is put out there. I try to make all decisions based on what is out there. I don't try to–I come at it with no preconceived ideas." Lee continued, "I mean, I haven't been in that position. It's hard for me to take [sic] and speculate at this time; but I will try my best to do that, yes." Trial counsel commented that Lee had "some hesitation." Lee answered, "Well, I think any time you get to this point that you

would have some hesitation if you are a thinking individual." Trial counsel then asked Lee to explain why she had said that she would "try" instead of answering with a definite "yes" or "no."

> [Lee]. I guess because I am an intelligent human being–or I like to think that I am–and I know that I probably have something in my head that wouldn't be allowable or whatever. I don't know about what it would be because I haven't been put in that position. I haven't had that question asked. So, you know, I'm trying my best to think of different things that might make me lean one to the other. I can't come up with one, but that doesn't mean it's not there.

> [Trial counsel]. Okay. Let me give you a little more context, okay?

> [Lee]. Okay.

> [Trial counsel]. Again, a guilty capital murderer. Okay? And I want to put you in that chair. During the course of a Capital Murder trial you would see and hear really gruesome details.

> [Lee]. Yes, ma'am.

> [Trial counsel]. You would see autopsy photos, crime scene photos, hear the scene described in detail, right?

> [Lee]. Right.

> [Trial counsel]. That's hard to hear.

> [Lee]. Yes, ma'am.

> [Trial counsel]. And, you know, . . . someone's loved one is gone, right?

> [Lee]. Right.

> [Trial counsel]. So you're probably going to hear how that impacted them as well.

> [Lee]. Right.

> [Trial counsel]. And so you've heard all that and you've seen all that when you get to this first Special Issue. So they are a guilty capital murderer. You've seen the horrible things that happened. You've seen, you know, the family is very upset. Knowing all that, seeing all that, you and 11 others determined that this person is guilty of Capital Murder, can you ever answer that question no?

[Lee].  I could.

[Trial counsel].  Okay.

[Lee].  I could.

Trial counsel later extended the hypothetical, asking Lee to imagine that the jury had also found the defendant to be a future danger.  Trial counsel then asked Lee whether she would "ever consider anything that would lessen the blame of that person."

[Lee].  I think I could.  You know, again, not being in the position, trying to forecast myself there, I would hope that I could still–and I think I could still–consider other circumstances, mitigating things that happen.

[Trial counsel].  Do you have doubts?

[Lee].  Yes, I do.

[Trial counsel].  Tell me about that.

[Lee].  I just–it's hard for me to picture once coming to those two things that there is something out there.  However, you know, it is a possibility that it's out there.

[Trial counsel].  Okay.  You said it's hard for you to consider that?

[Lee].  It's just hard to think of it.  Not consider.  I mean, that's probably the wrong word.  But it's hard to come up with it in my head right now.  I can't imagine it.

[Trial counsel].  Okay.

[Lee].  But that doesn't mean it's not there.

[Trial counsel].  Sure.  But I need to know whether or not you can do that.  It's a guilty capital murderer.  You have determined beyond a reasonable doubt that they are going to be a future danger.  Can you ever consider anything that will lessen the blame of that guilty murderer?

[Lee].  I could consider it if I can see it.  I mean, I don't know what it would be.  I don't what that mitigation could be.  I don't know what it would be.  I just don't.

Trial counsel also revisited Lee's exchange with the prosecutor about confessions, then asked Lee to imagine that: she was a juror in a capital-murder case; the offense was "horrific"; the defendant had given the police a detailed, videotaped confession in which he told how and why he committed the offense, and showed no remorse; and Lee believed the confession, but she and the other jurors found that the police had omitted a warning when they "Mirandized" the defendant. Lee agreed with trial counsel that, by omitting a required warning, the police had violated the law.

> [Trial counsel]. So then you would be given an instruction from the Court that you could not consider–you have to wholly disregard that confession and you could not consider it for any purpose.
>
> [Lee]. Yes, ma'am.
>
> [Trial counsel]. You said you could do that?
>
> [Lee]. It would not be easy.
>
> [Trial counsel]. Of course not.
>
> [Lee]. It would have to be a conscious decision to set it aside. I think that I can do that. Sitting on one of the prior juries we had something similar. And to be honest, it came up in deliberations but we told them it had to be set aside and it could not be considered as part of it. I cannot answer for anybody else on the jury. I can say [that it] was not used in my decision. Okay? It was not nearly to the extent as this one. Okay?
>
> [Trial counsel]. Okay. And that's kind of my point. What kind of case was that?
>
> [Lee]. It was on the DUI.
>
> [Trial counsel]. Okay. And now we're talking about a murder.
>
> [Lee]. Right. It's very difficult to unsee, unhear. So it does have to be a conscious decision to set it aside. It is hard to do, and I'm not sure that anybody can answer 100 percent that they do it. I really can't tell you that.
>
> [Trial counsel]. So you can't answer 100 percent?

[Lee]. No. I can say that it would be something that I would try to do and that I would be conscious of it, but I cannot say that it would not be in there.

[Trial counsel]. Okay. So are you telling me you would–you can't say you wouldn't consider it?

[Lee]. No, I can't say that I cannot.

At this point, the prosecutor objected to the form of trial counsel's question. At the bench conference that followed, the prosecutor argued that trial counsel had asked an improper commitment question. The prosecutor further argued that, to the extent trial counsel was asking the question as a prelude to a challenge for cause, trial counsel had not explained the law to Lee and asked whether she could follow it. The trial court sustained the objection.

When questioning resumed, trial counsel reminded Lee that they had been discussing "this confession" and that trial counsel needed "to know where [Lee was] on that."

[Lee]. Again, as I said, it's very hard to unhear or unsee; and it's a conscious decision to not take that into consideration. And, you know, you try to set it aside as best you can. I'm going to say that I would probably–again, not being in the situation, it's hard for me to say definitely that I would be able to set it aside totally. I would try my best to do so. And that's about the best answer I can give you on it.

[Trial counsel]. Okay. Let me take it one step further. Okay? The confession is what, for you, proved the case beyond a reasonable doubt.

[Lee]. Then I would have to say that I would take that into consideration and say that it would be not–I would have to find either the not guilty or the not step [sic] or whatever. Because if that's what tipped the balance and it was something that I could say that otherwise the case was not proven, then I would have to say that I would have to go on the other side. I would say that it was not guilty, not death penalty, whatever, if that was the scale.

[Trial counsel]. Okay. So let me just make sure I understand you. You've heard a confession. You believe it a hundred percent.

[Lee]. Right.

[Trial counsel].  But you also believe that the police missed a warning.

[Lee].  Right.

[Trial counsel].  And this confession is what, for you, would prove their case beyond a reasonable doubt.

[Lee].  Right.  If there was not a supporting documentation, whatever, behind that that would have caused me to be on the guilty [sic], then I would have to say not guilty because it is the deciding factor for me.

[Trial counsel].  Well, you don't have–let's say you don't have any other supporting documentation?

[Lee].  Then I would have to say that there was nothing–the case had not been made.

At the conclusion of Lee's voir dire, trial counsel challenged her for cause on the grounds that she was "an automatic death penalty juror" who "would not consider future danger, and . . . would not consider mitigation" and because Lee could not "say it's a hundred percent for her that she could disregard the confession."  The trial court denied the challenge, stating, "Based on her demeanor and the thoughtful way that she answered the questions, I think the hesitation that was referred to is an indication, to me at least, of an honest reflection that a person gives that will seriously consider all of the options and take this very seriously."

The trial court did not abuse its discretion by denying appellant's challenge for cause to Lee, as the totality of her voir dire examination contains sufficient evidence to support the trial court's ruling.  *Davis*, 329 S.W.3d at 807.  To the extent Lee vacillated or gave ambiguous or unclear answers concerning her ability to follow the law, we accord particular deference to the trial court's decision.  *Gardner*, 306 S.W.3d at 295; *Moore*, 999 S.W.2d at 400, 407.  Further, the trial judge was in the best position to evaluate Lee's demeanor and responses.  *See Davis*, 329 S.W.3d at 807.  Point of error five is overruled.

*Vanscoy*

In point of error six, appellant alleges that Vanscoy was challengeable for cause because she indicated that she would be "automatic death" if she had to decide punishment in a case in which there was "no reason for a murder or two people were murdered." He also asserts that Vanscoy "was a disabled juror in regards to her personal beliefs when it came to answering the mitigation special issue."

When she questioned Vanscoy, the prosecutor covered the concept of concurrent causation and its effect on a defendant's criminal responsibility, which Vanscoy indicated that she understood.[9] The prosecutor also discussed the punishment-phase special issues. Vanscoy indicated that she understood those special issues and would answer them according to the law and evidence. After discussing the mitigation special issue and what kind of evidence might be considered mitigating, the prosecutor gave Vanscoy the following hypothetical: "You and 11 other jurors have just found someone guilty of Capital Murder. It was a horrible, brutal Capital Murder. No self-defense, no provocation from the victim, innocent victim, no insanity, no excuse; and you found him guilty of Capital Murder." Vanscoy agreed that: life without parole and death were the two available penalties; her "true feelings" were that she would consider both alternatives; she would keep an open mind; and she would not have her mind made up one way or another after finding someone guilty of capital murder.

---

[9] The concept was relevant in this case because of evidence that victim Alton Wilcox's medical condition and treatment might have affected his chances for survival. Specifically, at the punishment phase, the State presented evidence that Wilcox suffered multiple stab wounds, including one that perforated his heart's left ventricle. The emergency room surgeon who treated Wilcox testified that the hole in the left ventricle was lethal without surgical intervention. He explained that Wilcox's only chance at survival had been a very risky surgical procedure, which was complicated by scar tissue on the heart from an earlier open heart surgery. The surgeon stated that the effort to save Wilcox's life was unsuccessful because the right ventricle tore open during the procedure, but he testified that Wilcox would also have died if he had done nothing.

Trial counsel began the voir dire examination of Vanscoy by referring to the State's hypothetical and asking what her "feelings about the death penalty as an appropriate punishment" were under that scenario. Vanscoy responded, "I think the death penalty should be warranted unless there [are] other circumstances, you know, the upbringing of the person like we had talked about earlier." When trial counsel asked her to elaborate, Vanscoy stated, "Well, I guess if, you know, they–like we talked about, that they hadn't been raised correctly, they hadn't been taught morals. I think that needs to be, you know, a factor in the decision."

Trial counsel then emphasized that he was trying to ascertain what Vanscoy "would be feeling right after when [she] found this person guilty," and he reminded her that the hypothetical assumed especially heinous facts. Vanscoy answered, "I think they should get the death penalty" because "we don't have a right" to take another life. However, Vanscoy denied that she would assess the death penalty in every case of capital murder. She explained that she "would need to hear about the situation. You know, the case itself and exactly what happened." Vanscoy continued, "I know that, you know, if they are found guilty, I would have the death penalty. I would be thinking about that. But I would definitely want to have heard, which I would have, all the evidence from both sides." Trial counsel continued to question Vanscoy.

> [Trial counsel]. Okay. So when earlier when [sic] you said that you felt the death penalty would be warranted if a life was taken, can you tell me more about that?
>
> [Vanscoy]. Well, if a life is taken and, you know, the evidence shows that he or she had really done that, I would definitely–I could give the death penalty.
>
> [Trial counsel]. Okay. And I understand. And of course, you'd have to be able to consider the full penalty range to be a death qualified juror.
>
> [Vanscoy]. That's right.

[Trial counsel].  What I'm trying to figure out is would you automatically–or would you think that only the death penalty would be warranted if a life was taken?

[Vanscoy].  No.

When trial counsel asked her to explain her answer, Vanscoy stated, "I just think there [are] just circumstances about the situation that caused–you know, caused the death, what was going on. And then I would either think it was death penalty or life in prison." Trial counsel resumed questioning Vanscoy.

[Trial counsel].  Okay.  Can you tell me what would be important to you when you said you'd have to know what had been going on?  What's in your mind when you say that?

[Vanscoy].  Well, I guess if somebody came in and, you know, killed two people just because, you know, they didn't like them or something, to me the death penalty would be that because they are taking a life without reason.

[Trial counsel].  Okay.  So if you were in a situation where someone had been–committed–and you understand that one of the ways to commit Capital Murder is by killing more than one person.  So if you were seated on a Capital Murder jury and it was shown that two people had been killed, would that mean that for you the penalty for that crime would be only death?

[Vanscoy].  Yes.

[Trial counsel].  Okay.  Can you think of any other situations where you would feel that way?

[Vanscoy].  Not that I can think of.

[Trial counsel].  Well, let's go–let me go back to what you were talking about before.  You said for no reason.  And when you say somebody had killed somebody for no reason, what were you thinking about when you said that?

[Vanscoy].  Okay.  For no reason is if somebody came in and had a gun and came in and saw two people standing there and then decided to kill them and then decided after that maybe they wanted to rob them after–or whatever, you know.  Get them out of the way, and then commit this unlawful act.

[Trial counsel]. Okay. And under those circumstances that you just said, would that be an automatic death penalty punishment for you?

[Vanscoy]. To me it would.

Trial counsel then asked whether Vanscoy had held her "death penalty views" her entire life.

[Vanscoy]. No, not my whole life. No. Probably the last 20 years maybe.

[Trial counsel]. All right. And are these feelings that you feel strongly about?

[Vanscoy]. Yes.

After discussing other topics with Vanscoy, trial counsel focused on the special issues. Vanscoy stated that she could envision herself answering "no" to the future-dangerousness special issue, and "yes" to the mitigation special issue. Vanscoy also stated that she might answer the mitigation special issue "yes" based on mercy alone. Vanscoy answered "yes" when trial counsel asked whether she "[c]ould consider and give effect to" evidence of low intellectual functioning and drug addiction as mitigation. Vanscoy answered "no" when trial counsel asked whether she "could consider and give effect to" evidence of "desperation." Trial counsel then alluded to the "fire example" that the prosecutor had used to illustrate the concept of concurrent causation.

[Trial counsel]. . . .Would you consider a causation situation like that? Could you consider and give effect to that as mitigation?

[Vanscoy]. No.

At the conclusion of Vanscoy's voir dire, trial counsel challenged her for cause, arguing that her responses to the hypothetical he gave her showed that she was "an automatic death penalty juror." Trial counsel further argued that Vanscoy was "mitigation impaired" because she had answered "no" when he had asked whether she could consider and give effect to evidence of desperation and causation. After hearing the parties' arguments, the trial court stated that it had observed Vanscoy's

demeanor and responses to all the questions and would deny the challenge for cause.

The trial court did not abuse its discretion by denying appellant's challenge for cause to Vanscoy, as the totality of her voir dire examination contains sufficient evidence to support the trial court's ruling. *Davis*, 329 S.W.3d at 807. The law does not require that a juror consider any particular piece of evidence to be mitigating. *Hernandez v. State*, 390 S.W.3d 310, 315 (Tex. Crim. App. 2012). To the extent Vanscoy vacillated or gave ambiguous or unclear answers concerning her ability to follow the law, we accord particular deference to the trial court's decision. *Gardner*, 306 S.W.3d at 295; *Moore*, 999 S.W.2d at 400, 407. Further, the trial judge was in the best position to evaluate Vanscoy's demeanor and responses. *See Davis*, 329 S.W.3d at 807. Point of error six is overruled.

In point of error seven, appellant argues that the trial court "erred in failing to allow [him] additional peremptory challenges upon his request before the 12th juror was seated" because the trial court erroneously refused to strike Woods, Cooper, Lee, and Vanscoy "and thereby forced [appellant] to use one or more of his peremptory strikes because of the error." Appellant's claim fails because he has not shown that the trial court abused its discretion in denying his challenges for cause to these four jurors. Point of error seven is overruled.

### Limitation on Voir Dire

In points of error eight through ten, appellant complains of the trial court's rulings when the State objected to certain questions that trial counsel attempted to ask of venire members Donna Vanscoy, Stephanie Cooper, and Audrey Holt during their individual voir dires. Specifically, appellant alleges that "the trial court erred in preventing the defendant from acquiring from [Vanscoy, Cooper, and Holt] information with which to intelligently exercise his peremptory challenges and

challenges for cause during jury selection."

Concerning Vanscoy, the portion of the record to which appellant directs us shows that trial counsel did not object on this basis or otherwise make this argument to the trial court when it disallowed the question at issue.[10] Accordingly, he has not preserved his complaint for our review. *See* TEX. R. APP. P. 33.1; *Bekendam*, 441 S.W.3d at 299–300. Point of error eight is overruled.

We now turn to points of error nine and ten, concerning venire members Cooper and Holt. We review a trial court's ruling that limits voir dire questioning for an abuse of discretion, focusing on whether the appellant proffered a proper question regarding a proper area of inquiry. *Hernandez*, 390 S.W.3d at 315; *see Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002) (trial court has broad discretion over the process of selecting a jury and in determining the propriety of a particular question). "A trial court retains discretion to restrict voir dire questions that are confusing, misleading, vague and broad, or are improper commitment questions." *Hernandez*, 390 S.W.3d at 315. When the trial court "does not place an absolute limitation on the substance of an appellant's voir dire question, but merely limits a question due to its form, the appellant must attempt to rephrase the question or risk waiver of the alleged voir dire restriction." *Id*.

In point of error nine, appellant directs us to an exchange in the record, in which trial counsel

---

[10] The record shows that trial counsel asked the following question of Vanscoy.

> Now, when we talk about this mitigation, where would you–as far as the way this goes, where would you–I know it says taking into consideration all the evidence, including the circumstances of the offense, Defendant's character and background, personal moral culpability of the Defendant, where would you expect the mitigation to come from?

The prosecutor objected. At the bench conference that followed, the prosecutor argued that trial counsel's question was repetitious, confusing, and misleading, noting that "there may or may not be mitigation in a case depending on the evidence." Trial counsel responded, "I'm asking her if she assumes that we're going to bring it" because "then that would be putting the burden on us," and that "[t]here is no asked and answered in voir dire." The trial court sustained the objection, and the bench conference ended with no additional argument from trial counsel.

gave Cooper the following hypothetical.

> [Trial counsel]. . . . I'd like you to consider that you sat as a juror on a different Capital Murder case and you know that–and the Judge instructs you that Capital Murder is an intentional murder where it was the Defendant's conscience [sic] desire to kill and the Defendant accomplished that desire along with some other serious crime. Like, for example, one of the things [the prosecutor] mentioned was killing a police officer. You know that could be Capital Murder.
>
> [Cooper]. Right.
>
> [Trial counsel]. So you and the 11 other jurors heard all the evidence and decided beyond a reasonable doubt that the Defendant in that case intentionally or knowingly killed –
>
> [Prosecutor]. Objection. Not knowingly.
>
> [Trial counsel]. Intentionally killed an innocent victim who did not deserve to die. Are you with me?
>
> [Cooper]. Yes.

Trial counsel then listed a litany of possible legal defenses or justifications to criminal liability for the offense and emphasized that the jury had not found any to exist. Reiterating that there were "[n]o defenses" and stating that there were no "other circumstances," trial counsel additionally emphasized that the murder was "[j]ust a senseless, cold-blooded killing." Trial counsel continued, asking the question that is the subject of point of error nine.

> Assume that you and the 11 other jurors all agreed beyond a reasonable doubt that all that's true. I'm going to ask you about your feelings. What are your feelings in that hypothetical about the death penalty being the only appropriate remedy for that guilty murderer?

The prosecutor objected to the form of the question. At the ensuing bench conference, the prosecutor argued *inter alia* that it was an improper commitment question and it was misleading because it suggested that there was only one appropriate penalty for capital murder. The trial court

"sustain[ed] the objection to the way the question was asked."

> [Trial counsel]: Does the Court have a recommendation as to how I can ask the question that would be non-objectionable?

> The Court: I can't. I can't give you suggestions on how to ask them.

> [Trial counsel]: I'd like to make a bill.

> The Court: Okay.

Trial counsel resumed her voir dire of Cooper without attempting to rephrase the question. At the conclusion of Cooper's voir dire, trial counsel made a bill of exception, then challenged the venire member for cause. After the trial court denied the challenge for cause, trial counsel exercised a peremptory strike to remove Cooper from jury service.

The trial court did not place an absolute limit on the substance of trial counsel's question. Rather, the trial court merely limited the question due to its form, and trial counsel did not thereafter attempt to rephrase the question. Accordingly, appellant waived any complaint concerning the alleged voir dire restriction. *See Hernandez*, 390 S.W.3d at 315. Point of error nine is overruled.

The record of venire member Holt's individual voir dire shows that, after inquiring into Holt's "feelings on the death penalty," trial counsel then pursued a different line of questioning.

> [Trial counsel]. Okay. You said you live here in Angleton. Is that right?

> [Holt]. Yes.

> [Trial counsel]. Okay. Do you have a feel for what the community thinks about the death penalty? Do you think most of the community is in favor of it?

The prosecutor objected to "relevancy and improper form of the question by venire [sic] about the Angleton community." A bench conference followed.

> [Trial counsel]: Your Honor, this is not a witness in a case. It's a juror in a Capital

Murder case. There is no relevancy objection to determining a juror's feelings on all the issues at stake in this case. Voir dire is intended to be very broad.

The Court: I agree. But to elicit facts.

[Prosecutor]: It's her feelings, not a community's feelings, on their perspective in an effort to put pressure on the venireman [sic].

The Court: I'm going to sustain the objection as to the community's feelings.

Holt's voir dire examination resumed. At its conclusion, trial counsel challenged her for cause. After the trial court denied the challenge, trial counsel exercised a peremptory strike to remove Holt from jury service.

Assuming that appellant preserved the alleged voir dire error for appellate review, we find no abuse of the "broad discretion" that a trial court has over the process of selecting a jury. *See Barajas*, 93 S.W.3d 36, 38–39 ("The main reason for [the trial court's broad discretion] is that voir dire could go on forever without reasonable limits."). Appellant has not shown that Holt's perceptions of the community's views about the death penalty was "an issue applicable to the case" or that his question was reasonably designed to uncover grounds for a challenge for cause. *See id.* at 38–39. Point of error ten is overruled.

We affirm the judgment of the trial court.

Delivered: March 9, 2016
Do Not Publish